[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 482.]

THE STATE OF OHIO, APPELLEE, *v.* ALLARD, APPELLANT.

[Cite as *State v. Allard*, 1996-Ohio-208.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 95-1060—Submitted February 21, 1996—Decided May 22, 1996.)

APPEAL from the Court of Appeals for Knox County, No. 93-7.

_____

{¶ 1} Jerry Lee Allard, appellant, and Karen Marie Allard were married in September 1986. In August 1991, the marriage was dissolved by decree in the Court of Common Pleas of Knox County. Under the terms of the decree of dissolution, Karen was named the residential parent of the parties' three minor children: Aaron Allard, born April 2, 1987, Jay Allard, born May 1, 1988, and Rachael Allard, born August 2, 1989. The evidence reveals that appellant was never able to cope with the termination of the marriage.

{¶ 2} Between June or July 1991 and March 30, 1992, appellant made a number of statements indicating that he intended to kill himself, Karen and/or the three children. In June or July 1991, appellant repeatedly told Wanda Shrimplin, a baby-sitter, that he intended to kill Karen. Appellant told Shrimplin that if he could not have Karen, no one would, and that he intended to kill Karen and anybody she was with. In August 1991, following the decree of dissolution, appellant wrote a letter to a long-time acquaintance, Barbara Parsons. In the letter, appellant stated, "[w]ell my dissolution was made a matter of public record by way of newspaper. Karen and I are very good friends and I am working on getting her back. I see one of three things happening between us in the future, I want the first. One she takes me back and we start over. Second what I don[']t want to see but is more than likely * * * is I commit suicide. Third and least likely to happen is that I kill her cause she won[']t take me back[.] The third one is followed up by a full life in

prison oh what a bummer. Barb I love that woman with all my heart, soul, strength and being. I will not rest until she is mine again. This single parent stuff just doesn[']t get it. We went back to the traditional vows * * * for richer for poorer in sickness and in health *till death do us part*. I meant it 5 years ago and I mean it still I don[']t care what some man in a black robe says." (Emphasis *sic*.)

{¶ 3} Appellant made similar statements to a number of other witnesses. Maude Etler was appellant's co-worker from November 1991 through January 1992. According to Etler, appellant routinely "carried on about Karen, about how they were married, and they were divorced, and that he would be remarrying her because they were married 'til death do us part, and that's how it would end, with one of their deaths, and that if he ever caught her with anybody, he would kill her and the person that she was with." Appellant told Etler that he intended to kill Karen by stabbing her to death. On one occasion, while Etler was visiting appellant's apartment, appellant picked up a knife in the kitchen and said, "I could stab her [Karen] with this." On several occasions, appellant told Etler that he could get away with anything because he had a paper that "certified him nuts."

{¶ 4} Cathy Miller worked at an establishment appellant had visited almost every night between November 1991 and March 1992. Appellant frequently spoke to Miller about Karen and the children. Appellant told Miller that Karen's parents were trying to take the children away from him, and that "if he [appellant] couldn't have * * * [the children], no one could, that he would kill them." Additionally, appellant told Miller that he was on medication (lithium) for manic depression. According to Miller, appellant said that he could get away with anything if he were to stop taking his medication.

{¶ 5} On March 13, 1992, appellant told a friend, Helen Vance, that he was going to kill Karen. Appellant told Vance that he could quit taking his medication and become "violent enough to kill somebody." On one occasion, appellant told Vance that he would kill Karen if he ever caught her with another man. On March

13, appellant told another witness, Rebecca Garrow, that he wanted to get back together with Karen. According to Garrow, appellant said, "I might as well not have a family. We might as well be dead."

{¶ 6} Karen began dating Bruce Bartley in December 1991 or January 1992. On March 21, 1992, Karen and Bartley became engaged to be married. On or after the date of the engagement, appellant told Bartley that the marriage would never take place, that Karen and Bartley would never be together, and that appellant's children would never be Bartley's children. According to Bartley, appellant repeatedly stated that he (appellant) and Karen would remain together "Til death do us part."

{¶ 7} On March 28, 1992, appellant told an acquaintance, Carol Slayton, that if he could not have Karen, no one would. Appellant told another acquaintance, Dawn Schaade, that he planned to kill Karen and that he could "go off" if he quit taking his medication. On March 28, appellant told a co-worker, Kenneth Overholt, that he was going to "put Mount Vernon on the map." Additionally, on the evening of March 28, appellant approached an acquaintance, Mary Martin, and offered to pay her to "hurt" Karen. According to Martin, appellant opened his wallet and said, "[t]he more you hurt her, the more I'll pay you." Martin declined appellant's offer. On March 29, appellant told a friend, Deborah Van Houten, that he had stopped taking his medication and that he was going to kill Karen. Van Houten told appellant that no woman was worth going to jail for. Appellant responded by stating, "Oh, yes, she is." Van Houten's husband, Glenn Van Houten, also heard appellant's threatening comments.

{¶ 8} Pursuant to the decree of dissolution, appellant had been granted unsupervised visitation rights with his children. However, appellant frequently insisted that Karen accompany him during the court-ordered visitations. On March 30, 1992, appellant spent the evening at his apartment with Karen and the children. At approximately 8:00 p.m., Karen called her mother, Mary Ruth Berry. Karen left

a message on Berry's telephone answering machine that she (Karen) and the children would definitely be home by 10:00 p.m. At 10:49 p.m., Berry called the police because Karen and the children had not returned home. Berry asked police to check appellant's apartment because she feared that Karen was in danger.

{¶ 9} On March 30, at approximately 11:00 p.m., Sergeant Fred Gerber of the Mount Vernon Police Department arrived at appellant's apartment. Gerber heard crying and screaming coming from inside the apartment. When Gerber knocked on the door, appellant's outside porch light was immediately turned off. Patrolman Michael Merrilees arrived at the scene at approximately 11:08 p.m. Patrolman Roger Monroe arrived at the scene a few minutes later. The officers continued to knock on the door. Meanwhile, a police dispatcher contacted a representative from Moundbuilders Guidance Center, a local mental health organization that owned and/or operated the apartment complex. The representative gave police permission to break down appellant's door.

{¶ 10} At 11:18 p.m., police kicked-in appellant's door and discovered Karen's body in a sitting position on a living room couch. Police found the body of two-year-old Rachael Allard on the living room floor. During a protective sweep of the apartment, police discovered that appellant had barricaded himself in the bathroom with his two sons, four-year-old Aaron and three-year-old Jay Allard. Appellant shouted, "Get back. I have hostages." Appellant told police that he was holding a knife to his favorite son's (Aaron's) throat. Appellant threatened to kill the two boys and stated that he had already "cut" one of them. He asked police to check both Karen and Rachael for a pulse. Police informed appellant that they were unable to detect a pulse from either victim. At that point, appellant stated, "Then you know I mean business." Police heard appellant say that Karen had not wanted to get back together with him, and that Rachael would have grown up to be "a slut just like her mother."

4

{¶ 11} Police began negotiations with appellant for the release of the two boys. During negotiations, appellant demanded to speak with his former mother-in-law, Mary Ruth Berry. Appellant threatened to kill one of the boys if Berry was not brought to the apartment. Police complied with appellant's demand by bringing Berry into the apartment after covering the bodies of Berry's daughter and granddaughter. Berry spoke with appellant from outside the bathroom door. Appellant told Berry, among other things, "Mom, I'm sorry it had to come to this."

{¶ 12} Eventually, appellant agreed to surrender to police. Patrolman Monroe demanded that appellant release the injured boy (Aaron) first. Appellant opened the bathroom door and held a knife to Aaron's throat. Appellant then shoved Aaron towards Monroe and retreated back into the bathroom. Appellant released Jay in a similar manner. Thereafter, appellant dropped the knife, sprawled out face down on the floor of the apartment, and stated, "Don't hurt me. Don't hurt me."

{¶ 13} Karen had been stabbed or cut at least seventeen times in the area of her chest and neck. She had died as a result of the multiple stab wounds. A broken blade from a small paring knife was found in the fold of Karen's sweater. Police found the handle of the paring knife and the remaining portion of the broken blade on appellant's kitchen counter. Two other bloody kitchen knives (one steak knife and one serrated spatula or butter knife) were recovered from the apartment. A toxicology study of Karen's body fluids revealed that she had taken a potentially lethal overdose of drugs prior to being stabbed to death. Two-year-old Rachael had died as a result of multiple stab wounds to her thorax. Additionally, Rachael's neck had been cut or "slashed" with a knife. Aaron and Jay survived appellant's attack. Aaron was transported to Children's Hospital in Columbus for treatment of wounds to his neck. One of the wounds was a deep incised wound that had missed Aaron's trachea by millimeters, and had missed the carotid arteries by one-to-two centimeters.

{¶ 14} Aaron was able to recall some of what had happened on the night of the murders. Aaron testified that it hurt when appellant cut him with the knife. Aaron also testified that he had seen appellant cut and kill Karen and Rachael. According to Aaron, "Daddy threatened Mommy to take the pills by holding a knife up to Rachael's throat. * * * Mommy cried before Rachael did, then Rachael cried. The order they got killed -- first Mommy, then Rachael, then me; that's the order."

{¶ 15} Police recovered a number of incriminating items from appellant's apartment. Among these items was a letter appellant had addressed to "Mom & Dad." In the letter, appellant stated, "Karen and I have been supposedly trying to work things [out] but to no avail. She has slept with 4 different guys since our separation & Divorce. She keeps making major promises to me and has lied to me each time. Life is too painful to continue after I settle the score forever I[']m gonna end it. * * * I must take 4 other people to the grave with me * * *[.]" A second letter found in appellant's apartment was addressed to appellant's brother. In that letter, appellant stated, "I[']m going to write Mom an [*sic* and] Dad. I[']m going to tell them that their baby is going to prison for murder[.]"

{¶ 16} On March 31, 1992, appellant confessed to the killings. Appellant indicated that he had stabbed Karen to death as the result of an ongoing domestic dispute. Additionally, appellant indicated that he had forced Karen to take a large quantity of pills by holding a knife to the throat of one of the children. Appellant admitted that he had killed Rachael because "she would grow up and do the same damn thing, marry some guy, use him, abuse him, rip him off and then try to lose him, and that's the same damn thing her mother did." Appellant repeatedly stated that Rachael was "just like her mother." Additionally, appellant claimed that he had slashed Aaron's throat because Aaron was Berry's favorite grandchild. Appellant stated that the only reason he had demanded to speak with Berry during the hostage crisis was because he had wanted to torment her. During the confession, appellant suggested that he had never really planned to kill his victims.

Appellant claimed that he had simply "panicked" when the police had come to his door, and that he committed the murders because he had stopped taking his lithium.

{¶ 17} Appellant was indicted by the Knox County Grand Jury for the aggravated murders of Karen and Rachael Allard. Count One of the indictment charged appellant with purposely, and with prior calculation and design, causing Karen's death. Count Two charged appellant with purposely, and with prior calculation and design, causing Rachael's death. Each of the two counts of aggravated murder carried an R.C. 2929.04(A)(5) death penalty specification, alleging that the offense had occurred as part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons. Count Three of the indictment charged appellant for the attempted aggravated murder of Aaron Allard. Appellant was also indicted on one count of felonious assault (Count Four) for knowingly causing serious physical harm to Aaron.

{¶ 18} Appellant was tried before a jury. The jury found appellant guilty of all charges and specifications alleged in the indictment. Following a mitigation hearing, the jury recommended that appellant be sentenced to death for each of the two counts of aggravated murder. The trial court accepted the jury's recommendations and imposed the sentences of death. Additionally, the trial court sentenced appellant for the attempted aggravated murder of Aaron Allard (Count Three), but terminated the prosecution for felonious assault (Count Four) upon a finding that the offenses charged in Counts Three and Four of the indictment were allied offenses of similar import. On appeal, the court of appeals affirmed the judgment of the trial court and upheld the sentences of death.

{¶ 19} The cause is now before this court upon an appeal as of right.

————————————

*John W. Baker*, Knox County Prosecuting Attorney, and *Michael L. Collyer*, Special Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Cynthia A. Yost* and *J. Joseph Bodine, Jr.*, Assistant Public Defenders, for appellant.

———————————

**DOUGLAS, J.**

{¶ 20} Appellant presents a number of issues for our consideration. (See Appendix, *infra*.) We have carefully considered each of appellant's propositions of law and have independently reviewed appellant's death sentences for appropriateness and proportionality. For the reasons that follow, we affirm the judgment of the court of appeals and uphold the sentences of death.

I

{¶ 21} R.C. 2929.05 requires this court to review capital cases in a certain manner. However, we have held, in a series of prior cases, that R.C. 2929.05 does not require this court to address and discuss, in opinion form, each and every proposition of law raised by the parties in a capital case. See, *e.g.*, *State v. Scudder* (1994), 71 Ohio St.3d 263, 267, 643 N.E.2d 524, 528. We continue to adhere to our position on this issue.

{¶ 22} Here, we have conducted an exhaustive review of the record and have carefully considered each of appellant's twenty-eight propositions of law. Many of the issues raised by this appellant have been addressed and rejected under analogous circumstances in a number of our prior cases. Additionally, several of appellant's arguments have been waived. Upon review of appellant's propositions of law and a careful examination of the record, we fail to detect any errors that would undermine our confidence in the outcome of appellant's trial. We are convinced that appellant received a fair trial by an impartial jury, that he was competently represented by trial counsel, and that he received a fair and reliable sentencing determination. We address, in opinion form, only those issues that merit some detailed discussion.

II

**{¶ 23}** After the jury had returned its verdicts in the penalty phase of appellant's trial, the trial court *sua sponte* ordered the preparation of a presentence investigation report. Additionally, the trial court ordered the preparation of victim impact statements from the victims' family members. Specifically, the trial judge stated, on the record and in open court, "At this time, I am going to order a presentence investigation be done * * * and I'm also going to order a victim impact statement from Mrs. Berry, both for herself and on behalf of Aaron and Jay Allard." Appellant raised no objection, and a presentence report and victim impact statements were prepared for the trial court's consideration. At the subsequent sentencing hearing, the trial court, in handing down appellant's death sentences, stated, "[a]s required by Section 2929.03(D)(3), this Court has now considered all the relevant evidence introduced at both proceedings; the testimony, the exhibits, the statement of the defendant not given under oath, the arguments of counsel, *the presentence report, the victim impact statements*, and the mental examination reports as they pertain to Counts 1 and 2 of the indictment." (Emphasis added.) Appellant raised no objection to the trial court's consideration of the presentence investigation report and victim impact statements.

**{¶ 24}** In his first proposition of law, appellant contends that the trial court committed reversible error by *sua sponte* ordering and considering a presentence investigation report that had not been requested by appellant. We find no reversible error in this regard.

**{¶ 25}** Crim.R. 32.2(A) provides that "[i]n felony cases the court shall, and in misdemeanor cases may, order a presentence investigation and report before granting probation." R.C. 2929.03(D)(1) states that where death may be imposed as a penalty for aggravated murder, "[a] pre-sentence investigation * * * shall not be made except upon request of the defendant." Here, appellant was found guilty of two non-capital felony offenses (felonious assault and attempted aggravated murder), as well as two capital offenses. Thus, while the trial court could have

ordered a presentence investigation report in sentencing appellant for the non-capital felony offenses, the trial court clearly erred to the extent that it ordered and considered the presentence report for purposes of sentencing appellant on the two counts of capital murder. See *State v. Campbell* (1992), 69 Ohio St.3d 38, 41, 630 N.E.2d 339, 345, fn. 3. However, appellant never objected to the compilation or consideration of the presentence investigation report. Thus, appellant's contentions of error based upon the report have been waived. Accordingly, our discretionary review of appellant's contentions must proceed, if at all, under the plain-error analysis of Crim.R. 52(B). See *Campbell*, *supra*, at 41-43, 630 N.E.2d at 345-346.[1] Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise, *i.e.*, that but for the presentence investigation report, appellant would clearly have been sentenced to life imprisonment as opposed to death. *Id*.

{¶ 26} Here, there is no question that the trial court considered the presentence investigation report in sentencing appellant on the two counts of capital murder. The trial court specifically said that it had done so at the sentencing hearing. In addition, the trial court, in its written sentencing opinion, stated that "[b]efore imposing sentence [for the capital crimes], the Court reviewed the relevant evidence from both trials, the testimony, the exhibits admitted, the defendant's unsworn statement, the arguments of counsel, *the presentence report*, victim impact statements and the psychological reports concerning the defendant." (Emphasis added.) However, we are not persuaded that any prejudice occurred as a result of the trial court's consideration of the presentence report.

{¶ 27} In an attempt to demonstrate prejudice, appellant notes that the presentence investigation report contained a detailed account of the facts of this

---

1. In his brief, appellant asserts that there was no need to object to the trial court's order requiring the compilation of a presentence investigation report. However, at oral argument, appellant conceded that he had waived all but plain error by failing to object to the trial court's order.

case and quotes, at length, from a portion of appellant's videotaped confession which was not admitted into evidence at trial. In this regard, appellant points to a portion of the trial court's sentencing opinion entitled "Findings of Fact," wherein the trial court adopted, verbatim, the statement of fact contained in the report. However, the statement of fact contained in the presentence report was generally accurate in setting forth the facts of appellant's crimes. Moreover, there is nothing in the trial court's sentencing opinion to suggest that the trial court placed any undue reliance on factual matters not in evidence in determining that the aggravating circumstance outweighed the evidence presented in mitigation.

{¶ 28} Appellant also cites two instances in which the trial court allegedly "expressly referenced" the presentence investigation report in imposing the sentences of death. Appellant contends that the trial court's sentencing opinion "specifically referred to the portion of the P.S.I. in which Jerry [appellant] is described as unable to accept responsibility for his actions." However, the portion of the sentencing opinion to which appellant refers actually contains no specific reference to the presentence investigation report. Moreover, the evidence adduced at trial clearly established that appellant was unable to accept responsibility for his acts of violence. Appellant also contends that the trial court's sentencing opinion "relies upon information in the P.S.I. that suggests the victims' deaths were prolonged even though no such evidence was admitted at trial." However, such evidence was admitted at trial in the form of death certificates indicating that there were "several minutes" between the onset of the victims' wounds and their ultimate demise.

{¶ 29} The presentence report also contained a summary of appellant's prior criminal history. In his sentencing opinion, the trial court referred to appellant's criminal history in finding that the R.C. 2929.04(B)(5) mitigating factor (lack of significant criminal history) had no applicability in this case. However, the R.C. 2929.04(B)(5) mitigating factor was absent in this case with or without the

presentence investigation report, since appellant had never raised that factor in mitigation. In any event, the information concerning appellant's past criminal history was contained in certain defense exhibits that were admitted into evidence during the penalty phase, and in certain medical reports that were at issue during the penalty phase proceedings. Thus, the information in the report merely duplicated information that was already contained in the record before the trial court.

{¶ 30} We find that the case at bar is analogous to the situation presented in *Campbell*, *supra*, 69 Ohio St.3d 38, 630 N.E.2d 339. In *Campbell*, a trial judge presiding over a capital jury trial *sua sponte* ordered the preparation of a presentence investigation report after the jury had returned its verdicts recommending imposition of the death sentence. The presentence investigation report was considered by the trial judge in sentencing the defendant to death. The trial judge never cited any portion of the report as having any particular impact on the sentencing determination, and there was nothing in the record to indicate that the trial court gave any particular weight to the matters contained in the report. Further, both the trial jury and the court of appeals in *Campbell* unanimously found that the statutory aggravating circumstance the defendant was found guilty of committing outweighed the mitigating factors beyond a reasonable doubt, even though neither the jury nor the court of appeals had considered the presentence report. Under these circumstances, we found that the defendant had failed to establish that the trial court had committed plain error in ordering and considering the report. *Id.*, 69 Ohio St.3d at 43, 630 N.E.2d at 346. The same analysis applies here.

{¶ 31} Nevertheless, appellant attempts to distinguish *Campbell* on the basis that the trial judge in the case at bar specifically stated in the written sentencing opinion that he had considered the presentence investigation report. However, like the situation in *Campbell*, appellant has failed to demonstrate that

the presentence report had any significant impact on the trial court's ultimate decision to impose the death penalty. Here, as in *Campbell*, there has been no showing that but for the presentence investigation report, the result of the sentencing hearing would clearly have been different. See, also, *State v. Cook* (1992), 65 Ohio St.3d 516, 528-529, 605 N.E.2d 70, 83-84, in which we found no prejudice to a capital defendant where the trial court *sua sponte* ordered and considered a presentence report and cited in his opinion, among other things, information contained in the presentence report.

{¶ 32} Appellant also contends that the trial court converted certain matters contained in the presentence report into "nonstatutory aggravating circumstances." However, contrary to appellant's assertions, there is absolutely no indication in the trial court's sentencing opinion that any nonstatutory aggravating circumstances were considered and weighed against the evidence presented in mitigation. In this regard, we reject appellant's contentions that *State v. Davis* (1988), 38 Ohio St.3d 361, 528 N.E.2d 925, mandates reversal of the death sentences, and that this court's independent review is incapable of curing the trial court's err in ordering and considering the presentence report.

{¶ 33} In his second proposition of law, appellant contends that the trial court committed reversible error by ordering and considering victim impact statements in sentencing appellant on the two counts of aggravated murder. However, appellant never objected to the compilation or consideration of the victim impact statements. Thus, the plain-error analysis of Crim.R. 52(B) applies.

{¶ 34} Here, the trial court considered two letters, both of which discussed the impact of the deaths on the victims' family. One of the letters indicated that death was the only appropriate sentence for appellant. In this regard, we have previously held that expressions of opinion in victim impact statements regarding the appropriate sentence to be imposed upon the offender clearly exceed the scope of permissible victim impact evidence. See *State v. Fautenberry* (1995), 72 Ohio

St.3d 435, 439, 650 N.E.2d 878, 882. However, there is no indication that the trial court was influenced by or specifically relied upon the letters in sentencing appellant to death. Under these circumstances, we are not persuaded that the trial court's consideration of the victim impact statements had any effect on the sentencing determination.

{¶ 35} To establish plain error, appellant must be able to demonstrate that but for the victim impact statements, the trial judge would clearly have sentenced appellant to terms of life imprisonment for the aggravated murders of Karen and Rachael Allard. We find that appellant has failed to make this showing. Our finding is bolstered by the fact that both the trial jury and the court of appeals found that the aggravating circumstance for each killing outweighed the evidence presented in mitigation, even though neither the jury nor the court of appeals considered the victim impact statements in weighing the aggravating circumstance against the mitigating factors. Given this, we can hardly be certain that the trial judge would have sentenced appellant to life imprisonment but for the victim impact statements.

{¶ 36} Accordingly, for the foregoing reasons, we reject appellant's first and second propositions of law.

### III

**{¶ 37}** At the outset of the jury's penalty phase deliberations, the jurors sent a note to the trial judge requesting an answer the following question: "If sentenced to life in prison on both counts, will the sentences be concurrent or consecutive?" In response, the trial judge stated:

"Concurrent and consecutive are legal terms, and I don't remember them even being used throughout the trial, which ought to be a good indicator that it's nothing for you to be concerned with. Your role at this stage is to consider the aggravating circumstances, the mitigating factors, and make a recommendation to the Court on each count.

"Consider the counts separately. You are not to speculate as to what sentence the Court is actually going to impose or whether the sentences will be run concurrent or consecutive. That is not something for you to even consider in this matter. Your role is to make a recommendation as to what you think the Court ought to do, not to speculate on what the Court will do under certain circumstances. Is that clear?

"Okay. Resume your deliberations. Thank You."

**{¶ 38}** In his third proposition of law, appellant contends that the trial court's response to the jury's question impermissibly diminished the reliability of the jury's sentencing determination. Specifically, appellant contends that the jurors were seeking some assurance from the trial judge that appellant would remain in jail for the rest of his life if the jurors returned verdicts recommending imposition of life sentences. Appellant contends that "[b]y failing to inform the jury that it [the trial court] was statutorily bound to impose a life sentence if the jury * * * [recommended imposition of a life sentence] and what the consequences of that sentence were, the trial court permitted the jury to sentence Appellant while laboring under a fear that Appellant might possibly be turned loose upon society at some point in the *near* future." (Emphasis *sic*.)

{¶ 39} Our response to appellant's contention is twofold.  First, appellant's assertions regarding the jury's possible motives for asking about consecutive and concurrent sentences are purely speculative.  Second, the trial court's response to the jury's question was proper, since a jury has no option of recommending whether life sentences should run consecutively or concurrently.  *State v. Grant* (1993), 67 Ohio St.3d 465, 482, 620 N.E.2d 50, 69.  The trial court properly instructed the jury in the penalty phase as to the jury's possible sentencing recommendations:  death, life with parole eligibility after twenty years, and life with parole eligibility after thirty years.  The question concerning consecutive or concurrent sentences was not a matter for the jury to determine.

{¶ 40} Therefore, we find no error in the trial court's response to the jury's interrogatory and, accordingly, we reject appellant's third proposition of law.

IV

{¶ 41} Appellant's fourth proposition of law concerns the death-qualification process used during jury selection.  In *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, vacated and remanded on other grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452, this court held that "[t]he proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.  (*Wainwright v. Witt* [1985], [469 U.S. 412, 105 S.Ct. 844] 83 L.Ed.2d 841, followed.)"

{¶ 42} During *voir dire*, the trial judge asked prospective jurors the following question:  "If in a proper case where the facts warrant it and the law permits it, could you join in signing a verdict form which might recommend to the Court the imposition of the death penalty?"  Appellant contends that this question was insufficient to ferret-out those prospective jurors who would automatically vote for the death penalty.  Appellant suggests, and rightly so, that the defense in a

capital case is entitled during *voir dire* examination of prospective jurors to inquire whether the jurors would automatically vote to impose the death sentence, *i.e.*, to determine whether the jurors hold views concerning capital punishment that would preclude them from fairly considering a sentence other than death. See *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L. Ed. 2d 492. What appellant fails to recognize is that the trial court in this case permitted defense counsel wide latitude to inquire into each prospective juror's beliefs and opinions concerning the death penalty. Further, defense counsel exercised that right and questioned jurors extensively regarding their views on capital punishment. Thus, there was no reversible error in the death qualification process used in jury selection.

{¶ 43} Appellant also contends that the trial court erred in failing to excuse prospective juror Carolyn Sisley for cause. With respect to this issue, the court of appeals stated:

"Appellant next argues that the [trial] court erred in not excusing Juror Sisley for cause when she initially stated that it was not probable that she would vote to impose a life sentence, as her brother had been murdered. Appellant argues that she should have been immediately excused for cause, and that the court erred in rehabilitating her, citing *Morgan*, *supra* [504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492]. Appellant also argues that the court foreclosed him from making adequate inquiry into this juror's ability to remain impartial.

"The court did not err in failing to excuse Sisley immediately upon her response that it was possible, but not probable, that she could vote for a life sentence. Her statement was not an unequivocal statement that she would automatically vote to impose a death sentence. Rather, the response invited a further inquiry into her ability to decide the case based on the evidence and instructions.

"Counsel for appellant questioned Sisley for thirteen pages in the transcript regarding her ability to listen to mitigating evidence. Ultimately, appellant

rehabilitated the juror, as she responded that having heard the mitigating evidence and the court's instructions as to the law, she could return a verdict of life. * * * Contrary to appellant's claim that the court impermissibly foreclosed specific questioning regarding her ability to consider mitigating evidence, the court suggested that counsel for appellant explain to the juror the nature of mitigating evidence and give her examples, such as social history and psychological evidence. * * * The court did not err in failing to exclude this juror for cause, and we read nothing in *Morgan* which dictates a different result."

{¶ 44} We agree with the court of appeals' analysis of this issue. During *voir dire*, Sisley indicated that she would listen to mitigating evidence and legitimately weigh the evidence in accordance with the trial court's instructions. She indicated that despite her personal tragedy involving the loss of her brother, she could fairly listen to mitigating evidence and return a verdict of life imprisonment as opposed to a sentence of death. Defense counsel specifically asked Sisley the following question: "Having heard the facts of the case with regard to mitigation and as instructed by the Court as to the law, can you return a verdict of life imprisonment as opposed to imposing or voting to impose the death penalty?" Sisley responded in the affirmative. Upon a careful review of the *voir dire* examination of prospective juror Sisley, we conclude that the trial court did not abuse its discretion in refusing to excuse Sisley for cause. Moreover, we note that appellant ultimately exercised a preemptory challenge to remove Sisley from the jury.

{¶ 45} In his fifth proposition of law, appellant contends that he was required to exhaust all of his preemptory challenges during *voir dire* to remove biased and impartial jurors from the jury when, according to appellant, each of the prospective jurors removed by preemptory challenge should have been removed for cause. Specifically, appellant exercised his six preemptory challenges to remove prospective jurors Sisley, Black, Brokaw, Sheets, Ohde and Hawk. Appellant

contends that the trial court erred in overruling his challenge for cause with respect to prospective juror Sisley, and that the trial court should have, *sua sponte*, excused prospective jurors Black, Brokaw, Sheets, Ohde and Hawk.  Appellant's contentions are not well taken.

{¶ 46} R.C. 2313.42(J) clearly contemplates that "good cause" exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." Additionally, a prospective juror who has been challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased."  R.C. 2313.43.

{¶ 47} Again, we find that the trial court did not abuse its discretion in rejecting appellant's challenge for cause against prospective juror Sisley.  Sisley stated during *voir dire* that she could set her personal feelings aside and follow the trial judge's instructions in this case.  Sisley indicated that she could fairly assess the evidence and, if the facts and law dictated, recommend a verdict of life imprisonment.  See discussion, *supra*.

{¶ 48} During *voir dire*, prospective juror Black mentioned that he had formed opinions concerning appellant's case based upon what he had previously read in a newspaper.  Black also indicated that he was bothered by the fact that a small child had been murdered.  However, Black stated that he could impartially decide the case based on the law.  Prospective juror Sheets indicated during questioning that he had read about the case in the newspaper.  However, Sheets indicated that he would decide the case based solely on what he saw and heard in the courtroom.  Likewise, prospective juror Ohde indicated during questioning that he might have formed a "little bit" of an opinion about the case based on what he had read in the newspaper.  However, Ohde indicated that he would decide the case based upon what he saw and heard in the courtroom, and that his exposure to the newspaper accounts of the murders would not be a factor in his decision.

**{¶ 49}** Prospective juror Brokaw had read about the murders in the newspaper and had been exposed to certain information about the case by co-workers. However, Brokaw indicated that his conversations with co-workers and his prior exposure to the media would not affect his ability to hear the case. Brokaw was bothered by the fact that a small child had been murdered. Nevertheless, Brokaw indicated that he could set these feelings aside. At one point, Brokaw indicated that he would not give psychological testimony the same weight as other evidence. However, Brokaw ultimately stated that he would weigh the evidence in accordance with the trial court's instructions.

**{¶ 50}** Prospective juror Hawk stated that he had read about the case in the newspaper but that he had not formed an opinion based on what he had read. Hawk stated that he believed that not every person who commits a murder should receive the death penalty, and that he would follow the trial court's instructions in this case.

**{¶ 51}** Contrary to appellant's assertions, we find that none of these prospective jurors met the standard for challenges for cause. Thus, the trial court did not abuse its discretion in overruling appellant's challenge concerning prospective juror Sisley, and did not err in failing to *sua sponte* remove prospective jurors Black, Sheets, Ohde, Brokaw and Hawk. Moreover, in this proposition, appellant incorrectly asserts that nine biased jurors actually sat on his jury, namely, jurors Miller, McDonald, Nugent, Mills, Connell, Gallwitz, Pritchett, Reese and Wells. However, we have also carefully reviewed the *voir dire* examination of each of these members of the jury, all of whom indicated through responses to questioning that they could give appellant a fair trial and make a decision based solely on the evidence.

**{¶ 52}** Accordingly, for the foregoing reasons, we reject appellant's fourth and fifth propositions of law.

V

**{¶ 53}** In his sixth proposition of law, appellant contends that the trial court abused its discretion in finding that Aaron Allard was competent to testify at trial. Evid.R. 601 provides:

"Every person is competent to be a witness except:

"(A)  Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

**{¶ 54}** In *State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483, syllabus, we held that "[i]n determining whether a child under ten is competent to testify, the trial court must take into consideration (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful."  A determination of competency is within the sound discretion of the trial judge and will not be reversed on appeal absent a clear abuse of discretion.  *Id*. at 250-251, 574 N.E.2d at 486-487.  See, also, *Schulte v. Schulte* (1994), 71 Ohio St.3d 41, 43, 641 N.E.2d 719, 721.

**{¶ 55}** Aaron was five years old at the time of trial.  Before Aaron testified, the trial court conducted a *voir dire* examination of Aaron to determine competency.  The interview with Aaron took place in chambers where defense counsel and the prosecutor had an opportunity to question Aaron.  During the interview, Aaron indicated that he knew the difference between telling the truth and telling a lie.  He stated that people who do not tell the truth "get in trouble."  He was able to relay his full name, his age, the name of his school, and the names of his friends and his school teacher.  At the conclusion of the interview, the trial court found Aaron competent to testify.  At trial, Aaron explained what had happened on

the night of March 30, 1992. Aaron's testimony concerning the murders was consistent with the other evidence produced at trial concerning appellant's crimes.

{¶ 56} Appellant contends that Aaron incorporated some facts into his description of the murders which were uncorroborated by other evidence or testimony. For instance, Aaron testified at trial that someone named "Elizabeth" was baby-sitting for him on the night of the crimes. However, even if true, these additional matters to which Aaron testified were largely immaterial to his testimony concerning the murders. Appellant also suggests that some or all of Aaron's testimony was based on what his grandmother had told him. However, there is no evidence that Aaron spoke to his grandmother concerning the facts of the case. Additionally, Aaron's testimony does not read as though it were a recapitulation of facts told to him by his grandmother.

{¶ 57} Aaron's competency is adequately demonstrated on the record before us. Accordingly, we find no abuse of discretion in the trial court's determination that Aaron was competent to testify and, therefore, we reject appellant's sixth proposition of law.

VI

{¶ 58} In his twelfth proposition of law, appellant contends that he was deprived of the effective assistance of trial counsel. We find that appellant has failed to meet his burden of establishing ineffective assistance under the standards set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Our finding in this regard applies to all of the instances of alleged ineffectiveness set forth in appellant's brief. However, one of the alleged instances of attorney ineffectiveness is deserving of some further comment.

{¶ 59} Appellant contends that the "premier example" of attorney ineffectiveness occurred when defense counsel allegedly failed to adequately argue for the suppression of appellant's entire videotaped confession with the resulting

prejudice that the state was able to introduce a portion of the confession into evidence at trial. Appellant's argument lacks merit.

{¶ 60} On March 31, 1992, appellant confessed to the killings by making a lengthy statement to police. The statement was recorded on two videotapes, *i.e.*, appellant's initial statements to police, and a second statement. Prior to trial, appellant moved to suppress the entire videotaped confession (both videotapes). However, at a hearing on the motion, the state indicated that it would not offer the first statement into evidence at trial, even though the trial court found that appellant's first statement had been voluntarily given. With respect to appellant's second statement, the trial court denied appellant's motion to suppress, finding that the second statement would be admissible at trial.

{¶ 61} At trial, the defense and prosecution agreed to submit the second statement as a joint exhibit to be played for the jury during the state's case-in-chief. Appellant's attorneys prepared a seven-page memorandum to explain their rationale for so doing. The memorandum was submitted to the court and placed under seal. We have reviewed this memorandum and are completely satisfied that the defense attorneys had a sound and objectively reasonable basis for agreeing to the submission of the joint exhibit which, it appears, would not have been introduced into evidence but for the agreement between the state and the defense. Further, the prosecutor's brief in this case sets forth the following persuasive arguments why the record before us simply does not support a finding of ineffective assistance of counsel:

"While the State has not seen the 'Internal Memorandum' containing the defense attorney's rationale for seeking the admission of the tape, the record confirms that counsel employed sound trial strategy in seeking admission of the second video tape.

"The State presented overwhelming evidence that appellant committed two premeditated and calculated murders. Before committing those atrocities, appellant

23

discussed with no less than twelve civilians how, when, and why he was going to kill his wife and children. All twelve testified for the prosecution. Loaded down with overwhelming civilian testimony, a decision was made by the prosecution to jettison anything that might pose a Constitutional snag on appeal. This included appellant's confessions.

"Appellant sought admission of the tape [the second statement] because in light of the overwhelming evidence against him, he had nothing to lose. Through the tape, he would be able to tell the jury his side of the story without having to subject himself to cross-examination. Although appellant made two recorded statements, he was ultimately permitted to select the one which he thought portrayed him in the most favorable light. The defense used the statement to refute the State's theory that appellant planned his murders. In his final argument during the guilt phase, defense counsel raised as his first line of defense, 'I can suggest to you that there is evidence, the Joint Exhibit [Number] 83, which raises a question as to whether it was purposeful or intentional or whether it was a reaction, a panic situation * * *.'

"Moreover, as the proof of prior calculation and design was overwhelming, appellant cannot show that the outcome of the trial would have been different but for admission of the second tape."

{¶ 62} Again, we find that appellant has failed to meet his burden of establishing ineffective assistance of counsel under the standards set forth in *Strickland, supra.* Accordingly, we reject appellant's twelfth proposition of law.

VII

{¶ 63} In his fourteenth proposition of law, appellant contends that the trial court committed reversible error by allowing the state to introduce into evidence an exhibit that was irrelevant, prejudicial and misleading. Specifically, the subject of appellant's fourteenth proposition of law concerns a handwritten note found in appellant's kitchen that contained mail-order information for a set of "Miracle Blade" knives that carried a "lifetime no fault guarantee."

{¶ 64} During opening statements in the guilt phase, the prosecutor referred to the handwritten note as "one of the most horrifying things" found in appellant's apartment. However, the handwriting on the note was never analyzed, no investigation was ever conducted to establish that appellant had ordered these knives, and no evidence was presented at trial to link the knives to the murders. The trial court allowed the note to be introduced into evidence.

{¶ 65} The court of appeals found that the handwritten note was "only marginally relevant to the issue of prior calculation and design," but that the evidence was not unfairly prejudicial or misleading. Given the staggering, overwhelming evidence of appellant's guilt, we agree with the court of appeals' conclusion that appellant suffered no unfair prejudice from the admission of the handwritten note. Accordingly, we reject appellant's fourteenth proposition of law.

VIII

{¶ 66} In his fifteenth proposition of law, appellant contends that the trial court erred in allowing the state to present victim impact testimony during the guilt phase. Specifically, appellant complains that several witnesses for the prosecution were permitted to testify that Karen Allard feared appellant. Additionally, appellant claims that the testimony of Bruce Bartley, who had planned to marry Karen, should have been excluded as unduly prejudicial victim impact evidence.

{¶ 67} In *Fautenberry*, *supra*, 72 Ohio St.3d at 440, 650 N.E.2d at 882-883, we stated that "[t]rue victim impact evidence * * * shall be considered by the trial

court prior to imposing sentence upon a defendant, not during the guilt phase of the proceedings. Evidence relating to the facts attendant to the offense, however, is clearly admissible during the guilt phase. As a result, we find that evidence which depicts *both* the circumstances surrounding the commission of the murder and also the impact of the murder on the victim's family may be admissible during *both* the guilt and the sentencing phases." (Emphasis *sic*.) Here, the testimony concerning Karen's plan to remarry was relevant to appellant's motive to commit the murders. The testimony that Karen feared appellant was relevant to the issue of prior calculation and design because it tended to rebut appellant's assertions that he never intended to harm Karen and that his threats against her were essentially meaningless. In sum, we find that the evidence at issue in this proposition related to the facts attendant to the offenses. Thus, the evidence was clearly admissible, and the trial court did not abuse its discretion in permitting the testimony at issue.

{¶ 68} Accordingly, we reject appellant's fifteenth proposition of law.

IX

{¶ 69} The subject of appellant's sixteenth proposition of law involves the parade of witnesses—Wanda Shrimplin, Maude Etler, Cathy Miller, Helen Vance, Bruce Bartley, Carol Slayton, Dawn Schaade, Kenneth Overholt, Mary Martin, and Deborah and Glenn Van Houten—who testified concerning the threatening and incriminating statements appellant had made prior to the murders. Appellant contends that the testimony was cumulative and unfairly prejudicial, and that the trial court should have excluded the evidence under Evid.R. 403(A). We disagree.

{¶ 70} Appellant concedes that he failed to object to the testimony of the various witnesses. Thus, his arguments have been waived. Further, appellant's arguments lack merit. The defense admitted in its opening statement that appellant had killed Karen and Rachael. However, the defense maintained that the murders had not been planned and that appellant had simply panicked when the police had arrived at his door. Thus, the issue at trial was whether appellant had committed

26

the murders with prior calculation and design. In this regard, each of the state's witnesses testified concerning his or her unique encounters with appellant in the days, weeks, or months preceding the killings. Each witness heard appellant make some statement or comment that had a direct bearing on the issue of prior calculation and design. These statements and comments were highly probative of appellant's plan to kill, and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

{¶ 71} Accordingly, we reject appellant's sixteenth proposition of law.

X

{¶ 72} In his seventeenth proposition of law, appellant contends the trial court erred by allowing the state to present evidence of appellant's bad character where appellant had offered no evidence of his good character. See Evid.R. 404. Appellant's arguments lack merit.

{¶ 73} In this proposition, appellant essentially contends that the testimony complained of in his sixteenth proposition of law was not offered to prove any element of the crimes charged but was offered to portray appellant as "mean-spirited." However, the testimony at issue in appellant's sixteenth proposition of law was clearly offered to demonstrate the element of prior calculation and design. Appellant's attempt to categorize the testimony as impermissible character evidence is not persuasive.

{¶ 74} Additionally, appellant argues that the testimony of fellow inmate William Noel Strouse was particularly damaging evidence of appellant's bad character. Appellant told Strouse that he (appellant) had cut Aaron's throat and that Aaron "talks funny now" as a consequence of the neck wound. Strouse testified that appellant refers to Aaron as "squeaky" because of the way Aaron talks. Appellant also told Strouse that he never intended to kill Aaron. According to appellant, Strouse's testimony was evidence of appellant's bad character. We disagree. At trial, the state was required to prove the charge of attempted

aggravated murder. As the court of appeals ably recognized, "[e]vidence that appellant later callously referred to Aaron as 'Squeaky' tended to rebut his [appellant's] claim that he did not intend to kill Aaron." Moreover, appellant never objected to Strouse's trial testimony and, thus, the claims of error based upon Strouse's testimony have been waived.

{¶ 75} Accordingly, appellant's seventeenth proposition of law is not well taken.

XI

{¶ 76} Having considered appellant's propositions of law, we must now review the death sentences for appropriateness (also raised in appellant's twenty-fifth proposition of law) and proportionality. Appellant planned to kill his ex-wife and his children. He stabbed Karen to death, slashed Rachael's throat and stabbed her repeatedly, resulting in Rachael's death, and then attempted to kill Aaron by slicing Aaron's throat. Again, we find that the R.C. 2929.04(A)(5) aggravating circumstance of which appellant was found guilty in connection with each count of aggravated murder was proved beyond a reasonable doubt.

{¶ 77} In mitigation, appellant presented evidence that he never knew his natural father. Appellant's natural mother gave appellant up for adoption when he was nineteen months old. Between 1962, at the age of four, and the date of the mitigation hearing, appellant had no contact with his natural mother. Appellant was placed in a series of different foster homes during the first six and one-half years of his life. During this time, appellant was mistreated and physically abused by one of his foster fathers. Appellant also claims that he was sexually abused as a child. Records indicate that appellant was a seriously maladjusted child in deep psychological turmoil at the age of two. Appellant lived with one foster family, Mary and John Hall, from the time he was six and one-half years old until he reached adulthood. Appellant was one of four children who lived with the Halls during this period, and three of the four (including appellant) ended up in prison.

We assign these elements of appellant's history and background some, but very modest, weight in mitigation. (R.C. 2929.04[B].)

{¶ 78} Appellant was diagnosed as a diabetic at age sixteen. As an adult, appellant was voluntarily hospitalized at the psychiatric unit of the Knox Community Hospital. He was diagnosed as suffering from a bipolar affective disorder, depressed type, with mood congruent psychotic features, and with antisocial personality traits. Additionally, appellant was diagnosed as suffering from hyperthyroidism. Dr. James Eisenberg, appellant's court-appointed psychologist, testified that appellant suffers from a manic depressive mood disorder and a borderline personality disorder. Eisenberg opined that appellant was not insane at the time of the murders and that appellant appreciated the wrongfulness of his conduct. According to Eisenberg, appellant's love/hate relationship with women helps to explain the violence he perpetrated against Karen and Rachael on the night of March 30, 1992, and the violence inflicted on Aaron, who appellant considered to be his former mother-in-law's favorite grandchild. Eisenberg testified that appellant's marriage and relationship with Karen was bound to self-destruct, partially based on Karen's personality disorders.

{¶ 79} The evidence in mitigation clearly does not establish the existence of the mitigating factor that appellant lacked a substantial capacity to conform his conduct to the requirements of the law due to a mental disease or defect. See R.C. 2929.04(B)(3). However, we find that appellant's manic depressive mood disorder and borderline personality disorder as testified to by Dr. Eisenberg are entitled to some weight in mitigation. (R.C. 2929.04[B][7].)

{¶ 80} In an unsworn statement, appellant apologized for having taken the lives of his ex-wife and his two-year-old daughter, but claimed that he had never intended to kill them. Appellant expressed his love for both of the victims. Appellant stated that he wanted Karen to love him, and that he would never be able to forgive himself for what he had done to Rachael and Aaron. Appellant asked

God's forgiveness, and begged the jury, "please don't kill me." Additionally, appellant made a desperate plea to the jury that he had been denied his rights to a speedy trial. We assign these various matters no weight in mitigation.

{¶ 81} The evidence at the mitigation hearing also indicated that appellant would be able to adapt to prison life and function well within the confines of the penal system. We assign this evidence very minimal weight in mitigation. (R.C. 2929.04[B][7].)

{¶ 82} For each of the killings, we have weighed the aggravating circumstance against the evidence presented in mitigation. We find that the aggravating circumstance far outweighs the mitigating factors beyond a reasonable doubt. Indeed, we find that the evidence presented in mitigation absolutely pales in significance to the weight of the aggravating circumstance at issue here.

{¶ 83} Finally, we have undertaken a comparison of the death sentences imposed in this case to those in which we have previously imposed the death penalty. We find that appellant's death sentences are neither excessive nor disproportionate in comparison. See, *e.g.*, *State v. Kinley* (1995), 72 Ohio St.3d 491, 651 N.E.2d 419; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167; and *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894.

{¶ 84} For the foregoing reasons, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., TYACK, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

G. GARY TYACK, J., of the Tenth Appellate District, sitting for WRIGHT, J.

———————————

APPENDIX

{¶ 85} "Proposition of Law No. 1:  When the trial court ignores the express language of Ohio Rev. Code Ann. § 2929.03(D)(1) (Anderson 1993) and *sua sponte* orders a pre-sentence investigation report which contains prejudicial content, a capital defendant's rights to a reliable death sentence and due process of law under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 5, 9, 10, 16 and 20 of the Ohio Constitution are violated.

{¶ 86} "Proposition of Law No. 2:  When a trial court receives and considers victim requests for the death penalty, a resulting sentence of death is unreliable in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 87} "Proposition of Law No. 3:  Where the trial court fails to give an instruction which contains accurate information relevant to a potential sentencing alternative in response to a capital sentencing jury's inquiry on possible life sentences, the trial court diminishes the reliability of the jury's determination that death was the appropriate punishment, in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

{¶ 88} "Proposition of Law No. 4:  When a trial court applies an incorrect standard in death qualifying jurors and fails to excuse for cause a juror who expresses her inability to fairly consider the evidence, a resulting conviction violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 89} "Proposition of Law No. 5:  When the trial court erred in failing to excuse for cause prospective jurors that were biased and partial, it violated appellant's rights to an impartial jury, fair trial and due process as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States

Constitution and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

{¶ 90} "Proposition of Law No. 6: Where a criminal conviction rests on the testimony of a five year old witness and the witness is not competent to testify, the defendant is deprived of a fair trial in violation [of] the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution.

{¶ 91} "Proposition of Law No. 7: When gruesome and prejudicial photographs are admitted into evidence even though their prejudicial effect outweighs their probative value a capital defendant is denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

{¶ 92} "Proposition of Law No. 8: When a capital sentencing jury is not properly instructed, and receives erroneous instructions, the defendant is denied a fair and reliable sentence in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

{¶ 93} "Proposition of Law No. 9: When a trial court in a capital case fails to define mitigation, fails to instruct on the specific mitigating factors presented by the capital defendant, and fails to instruct the jury on the function, purpose and weight of defendant's mitigating evidence it violates the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, 16 and 20 of the Ohio Constitution[.]

{¶ 94} "Proposition of Law No. 10: The statements and instructions from the court, the prosecutor and defense counsel that the jury's verdict at the penalty phase was only a recommendation violated the Eighth and Fourteenth Amendments

to the United States Constitution as well as Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶ 95} "Proposition of Law No. 11: When a capital defendant presents expert psychological testimony relevant to the mitigating factors in Ohio Rev. Code Ann. Section 2929.04(B), it is error to evaluate this evidence under a sanity/competency standard in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, 16 and 20 of the Ohio Constitution.

{¶ 96} "Proposition of Law No. 12: Trial counsel's acts and omissions in their representation of Mr. Allard deprived him of the effective assistance of counsel as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio Constitution.

{¶ 97} "Proposition of Law No. 13: When prosecutorial misconduct permeates a capital trial, the defendant is denied his due process right to a fair trial in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

{¶ 98} "Proposition of Law No. 14: Where the trial court errs in admitting into evidence an exhibit that is irrelevant, prejudicial, confusing and misleading, it violates that defendant's rights as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, Article I, Sections 9 and 16 of the Ohio Constitution, and Ohio R. Evid. 401, 402 and 403.

{¶ 99} "Proposition of Law No. 15: The admission of victim impact evidence at the trial phases which does not also serve to prove the elements of the crime, violates the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

{¶ 100} "Proposition of Law No. 16: The admission of cumulative, and prejudicial testimony in a capital trial violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Section[s] 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 101} "Proposition of Law No. 17: It is reversible error in a capital prosecution for the state, in violation of Evid.R. 404, to introduce evidence allegedly showing appellant's bad character, where the appellant has not introduced evidence of his good character. Article I, Section 16 of the Ohio Constitution, Sixth and Fourteenth Amendments to the United States Constitution.

{¶ 102} "Proposition of Law No. 18: When a trial court permits the prosecuting attorney to elicit improper rebuttal testimony and present argument of non-statutory aggravating circumstances at the mitigation phase of trial, it prejudices a capital defendant in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10 and 16 of the Ohio Constitution.

{¶ 103} "Proposition of Law No. 19: The statutory definition of reasonable doubt in Ohio Rev. Code Ann. Section 2901.05 (Anderson 1993) reflects a clear and convincing evidence standard which allows jurors to return a conviction and death sentence based on a degree of proof below that required by the Due Process Clause of the Fourteenth Amendment.

{¶ 104} "Proposition of Law No. 20: When a trial court fails to conduct a relevancy determination for each exhibit prior to its readmission into evidence at the penalty phase of a capital trial, it commits prejudicial error, undermines the reliability of the capital sentencing process and is in violation of a capital defendant's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

{¶ 105} "Proposition of Law No. 21:  The cumulative effect of all errors at trial deprive an appellant a fair trial and a reliable sentencing determination in violation of the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

{¶ 106} "Proposition of Law No. 22:  When a trial [court] fails to consider and give effect to relevant mitigating evidence, a resulting sentence of death, violates the Fifth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, 16 and 20 of the Ohio Constitution.

{¶ 107} "Proposition of Law No. 23:  A prosecutor's systematic use of peremptory challenges to exclude all prospective jurors with some reservations about the death penalty violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 5, 10 and 16, Article I of the Ohio Constitution.

{¶ 108} "Proposition of Law No. 24:  A trial court denies a capital defendant the right to a fair and impartial jury when it denies him the ability to adequately voir dire potential jurors with a comprehensive questionnaire.  Sixth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution.

{¶ 109} "Proposition of Law No. 25:  The trial court erred by imposing the death penalty on appellant Allard as that punishment is inappropriate for him in violation of the Eighth and Fourteenth Amendments to the United States Constitution; Article I, Sections 9 and 16 of the Ohio Constitution; and Ohio Rev. Code Ann. § 2929.05(A) (Anderson 1993).

{¶ 110} "Proposition of Law No. 26:  Ohio's review process fails to [e]nsure against the disproportionate imposition of the death penalty in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 111} "Proposition of Law No. 27: A capital appellant, challenging his death sentence as disproportionate to cases in which the same or similar crimes were committed, is denied his rights to due process of law, equal protection and a reliable sentencing determination when the reviewing court limits the pool of cases for comparison to only those cases in which the death penalty was imposed. U.S. Const. Amend. VIII and XIV.

{¶ 112} "Proposition of Law No. 28: The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Rev. Code. Ann. §§ 2903.01, 2929.02, 2929.021, 2929.23, 2929.03, 2929.04 and 2929.05 (Anderson 1993), Ohio's statutory provisions governing the imposition of the death penalty, do no [*sic*] meet the prescribed constitutional requirements and [are] unconstitutional both on their face and as applied."