[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 223.]

THE STATE OF OHIO, APPELLEE, *v*. MITTS, APPELLANT.

[Cite as *State v. Mitts*, 1998-Ohio-635.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 97-268—Submitted December 2, 1997—Decided March 11, 1998.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 68612.

_____

{¶ 1} Appellant, Harry D. Mitts, appeals from his convictions and sentence to death for the aggravated murders of Sergeant Dennis Glivar and John Bryant and the attempted murders of Lieutenant Thomas Kaiser and Officer John Mackey.

{¶ 2} On the evening of August 14, 1994, Timothy Rhone helped his sister and brother-in-law, Jeff Walters, move into their apartment. The apartment was on the second floor in the same building where Mitts lived. Between 7:00 and 8:00 p.m., Rhone noticed a man, who he later learned was Mitts, carrying a gun tucked into the small of his back. Fifteen to thirty minutes later, Mitts, who was wearing blue target-shooting earmuffs, confronted Rhone in the hallway. According to Rhone, Mitts pointed a "black and huge" laser-sighted gun at Rhone's head and "told [him] to get out or [he] was going to fucking die." When Rhone replied that he did not understand, Mitts said, "I'm not joking, get out now." Rhone backed away and asked his mother and sister to call 9-1-1 because "a man with a gun [was] threatening to shoot people."

{¶ 3} A short time later, Tracey Griffin and her boyfriend, John Bryant, saw Mitts walking toward them wearing yellow glasses or goggles and carrying a gun. Griffin knew Mitts because they lived in the same apartment complex and their daughters had played together. Mitts's gun emitted a light, and Griffin saw a dot of red light appear on Bryant's chest. Mitts said, "[N]iggers, niggers, I'm just sick

and tired of niggers." Mitts aimed directly at Bryant, Griffin heard a shot, and Bryant fell down.

{¶ 4} Mitts then walked away, sporadically firing his gun, and later walked back toward Griffin, still firing his weapon, but now in her direction. In the meantime, Walters and Terry Rhone, Timothy's brother, came out to help Bryant. Mitts aimed his gun and shouted at them, "Leave him there, don't move." Walters and Terry Rhone disregarded Mitts's instruction and carried Bryant into their second-floor apartment.

{¶ 5} Around 8:15 p.m., Patrolman John Cermak arrived, and a bystander saw Mitts put a new clip in his gun. Taking "a ready [firing] position," Mitts fired several shots at Patrolman Cermak, forcing Cermak to drive his car up on a lawn and take cover. Lt. Kaiser and Sergeant Dennis Glivar then arrived. After firing at Patrolman Cermak, Mitts retreated to his first-floor apartment. Patrolman Cermak searched for Mitts, and Lt. Kaiser and Sgt. Glivar went to the apartment building's second floor, where they found Griffin, Bryant, and the Rhone family. After calling paramedics, Lt. Kaiser and Sgt. Glivar walked down to the first floor.

{¶ 6} As Lt. Kaiser and Sgt. Glivar approached Mitts's apartment, Mitts flung his apartment door open and opened fire with a gun in each hand. Mitts repeatedly shot Sgt. Glivar, forcing him to drop his shotgun, and he shot Lt. Kaiser in the chest and right hand. Lt. Kaiser switched his pistol to his left hand and forced Mitts to retreat by firing three or four times. Lt. Kaiser returned to the Rhone apartment, where he kept a watch on Mitts's apartment, and radioed for police assistance including the area S.W.A.T. team.

{¶ 7} Although wounded, Lt. Kaiser attempted for twenty to thirty minutes to talk Mitts into surrendering, but Mitts replied, "[T]he only way we're going to end this is if you kill me. You have to come down, you have to do your job and you have to kill me." Mitts, who had overheard Lt. Kaiser's S.W.A.T. request over Sgt. Glivar's abandoned police radio, additionally told Lt. Kaiser, "Go ahead, bring

the S.W.A.T. team in, I have thousands of rounds of ammunition. I'll kill your whole S.W.A.T. team. I'll kill your whole police department * * *."

{¶ 8} Mitts also threatened Griffin; Mitts told Lt. Kaiser that he was "going to come up and kill that nigger-loving bitch that's upstairs with you." Mitts also told Lt. Kaiser that he had been drinking bourbon and was angry because the Grand River Police Chief "stole [his] wife." Eventually, Patrolman Cermak dragged Sgt. Glivar's body from the hallway and Patrolman Cermak and others used a ladder and rescued Rhone's family and Lt. Kaiser from the upstairs apartment.

{¶ 9} During the standoff, Mitts called his ex-wife, Janice Salerno, and her husband, Grand River Police Chief Jonathon Salerno. Chief Salerno thought Mitts was joking when Mitts told him that "it's all over with now, I shot a couple of cops and I killed a fucking nigger." Chief Salerno, who believed Mitts was drunk, tried to talk him into surrendering, but Mitts refused. Mitts claimed that he had intended to kill both Salerno and his wife, but did not because Mitts's daughter, Melanie, lived with the Salernos.

{¶ 10} Around 8:40 p.m., Maple Heights Police Officer John Mackey responded to the call for police assistance from the city of Garfield Heights. After helping Patrolman Cermak rescue Lt. Kaiser and the Rhone family, Officer Mackey, Sergeant Robert Sackett, and others took tactical positions in the hallway outside Mitts's apartment. Taking over Lt. Kaiser's role as a negotiator, Officer Mackey talked with Mitts for over thirty minutes, but Mitts refused to surrender and, at various times, continued to fire shots. Using Sgt. Glivar's shotgun, Mitts fired twice into a mailbox across the hall, and he also emptied ten pistol shots into that mailbox. According to Officer Mackey, Mitts's voice appeared calm, and he "never showed any anger or * * * animosity towards" the officers.

{¶ 11} Around 9:30 p.m., Mitts discerned Officer Mackey's position in the upstairs apartment from the sound of his voice and fired up the stairway and through

a wall, hitting Officer Mackey's leg with a bullet fragment. Other police officers returned fire and rescued Officer Mackey.

{¶ 12} Around 1:00 a.m., the S.W.A.T. team injected tear gas into Mitts's apartment and finally subdued Mitts around 2:00 a.m. Mitts, who had been shot during the standoff, was taken by ambulance to a local hospital, then transported by helicopter to a trauma center at Cleveland's MetroHealth Medical Center. At 3:43 p.m., a blood sample was drawn from Mitts, and his blood-alcohol level was later determined to be .21 grams per one hundred milliliters.

{¶ 13} After arresting Mitts, detectives searched his apartment and found two sets of shooting earmuffs, a yellow pair of glasses customarily used on shooting ranges, a .44 caliber magnum revolver, a 9 mm automatic pistol, a .22 caliber pistol, a laser gun-sight, thousands of rounds of ammunition in boxes, and two nearly empty liquor bottles. The police later learned that Mitts had spent the afternoon target shooting at the Stonewall Range, a firing range. Upstairs in apartment 204, detectives found Bryant's body.

{¶ 14} Dr. Heather Raaf, a forensic pathologist, performed autopsies on John Bryant and Sgt. Dennis Glivar. Bryant bled to death within thirty minutes as a result of a single gunshot wound to his chest piercing both lungs and tearing the aorta. Sgt. Glivar died within "a few minutes" from five gunshots to the trunk causing perforations of his lung, heart, liver, kidney, stomach, and intestines. Sgt. Glivar also had been shot in the left shoulder and forearm. Dr. Raaf recovered multiple bullets or fragments from Sgt. Glivar's body and one small-caliber bullet from Bryant's body.

{¶ 15} A grand jury indicted Mitts for the aggravated murders of Sgt. Dennis Glivar (Count One) and John Bryant (Count Two) and the attempted murders of Lt. Thomas Kaiser (Count Three) and Officer John Mackey (Count Four). As death penalty specifications, Count One charged that Mitts knowingly murdered a peace officer in the performance of his duties, R.C. 2929.04(A)(6).

4

Both aggravated murder counts contained three separate course-of-conduct specifications relating to the other three shooting victims. See R.C. 2929.04(A)(5). All four counts also had firearms specifications, and Counts Three and Four added a specification that the victims were peace officers.

{¶ 16} At trial, Mitts did not contest the evidence proving the facts, but instead attempted to establish that he was too intoxicated to form the required intent to kill. After a penalty hearing, the jury recommended the death penalty on both aggravated murder counts. The trial court sentenced Mitts to death for the aggravated murders and to terms of imprisonment for the attempted murders. The court of appeals affirmed the convictions and sentences.

{¶ 17} The cause is now before this court upon an appeal as of right.

_____

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *David Zimmerman*, Assistant Prosecuting Attorney, for appellee.

*David L. Doughten* and *John P. Parker*, for appellant.

_____

**COOK, J.**

{¶ 18} In this appeal, Mitts advances eleven propositions of law. Finding none meritorious, we affirm his convictions. In accordance with the mandate of R.C. 2929.05(A), we have considered each of Mitts's propositions of law and have reviewed the sentence for appropriateness and proportionality.

{¶ 19} We have previously held that R.C. 2929.05 does not require this court to address and discuss, in opinion form, each proposition of law raised in a capital case. See, *e.g.*, *State v. Keith* (1997), 79 Ohio St.3d 514, 517, 684 N.E.2d 47, 54; *State v. Allen* (1995), 73 Ohio St.3d 626, 628, 653 N.E.2d 675, 680. Accordingly, we reject the eleventh proposition of law, a familiar attack on the constitutionality of Ohio's death-penalty statutes, for reasons we have often stated

before. We address the remainder of the propositions of law below and for the reasons that follow we affirm the judgment of the court of appeals.

I

The Guilt Phase

{¶ 20} In his second proposition of law, Mitts argues that the trial court erred in not allowing Dr. Sonya McKee, a psychiatrist, to answer a hypothetical question during her guilt-phase testimony.

{¶ 21} At trial, the defense called Dr. McKee, who testified that she had examined Mitts and found him competent, not suffering from any mental disease or defect, and responsible for his acts. Dr. McKee did think that Mitts was intoxicated on the day of the offenses and suffering from impaired memory as a result, and she answered various hypothetical questions on those points. But the court sustained the state's objection to a question concerning a hypothetical man, "B," who hated "black people [and] police officers," then got drunk, and shot a black man and a police officer. This question contrasted "B" with a hypothetical person, "A," presumably Mitts, who did not dislike blacks or police officers.

{¶ 22} Initially, we note that Mitts did not preserve this issue for review by proffering the substance of the excluded testimony. See Evid.R. 103(A)(2); *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147, syllabus. Even if it was properly preserved, we would find no abuse of discretion in the exclusion of this evidence. See *State v. Williams* (1996), 74 Ohio St.3d 569, 576, 660 N.E.2d 724, 732, citing *State v. Williams* (1983), 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444, syllabus. Under Evid.R. 403(A), the trial court must exclude evidence "if its probative value is substantially outweighed by the danger of * * * confusion of the issues, or misleading the jury." Defense counsel's attempt to secure Dr. McKee's opinion contrasting two hypothetical persons was misleading and confusing.

**{¶ 23}** Moreover, the trial court could have excluded the testimony because, except in the mitigation phase, "a defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that, due to mental illness, intoxication, or any other reason, he lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime." *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895, 906; accord *State v. Wilcox* (1982), 70 Ohio St.2d 182, 194, 24 O.O.3d 284, 291, 436 N.E.2d 523, 530; *State v. Slagle* (1992), 65 Ohio St.3d 597, 607, 605 N.E.2d 916, 927; *State v. Huertas* (1990), 51 Ohio St.3d 22, 27, 553 N.E.2d 1058, 1065 (rejecting expert witnesses as to the effect of intoxication). Thus, we reject Mitts's second proposition of law.

**{¶ 24}** By his fourth proposition of law, Mitts challenges the trial court's refusal to instruct the jury on voluntary intoxication when "a reasonable jury could find that the defendant could not form the requisite intent due to * * * inebriation."

**{¶ 25}** As we recognized in *State v. Fox* (1981), 68 Ohio St.2d 53, 54-55, 22 O.O.3d 259, 260, 428 N.E.2d 410, 411, "[t]he common law and statutory rule in American jurisprudence is that voluntary intoxication is not a defense to any crime." Nonetheless, "where specific intent is a necessary element, * * * if the intoxication was such as to preclude the formation of such intent, the fact of intoxication may be shown to negative this element." *Fox,* 68 Ohio St.2d at 55, 22 O.O.3d at 260, 428 N.E.2d at 411-412.

**{¶ 26}** In denying the defense request for an instruction on intoxication, the trial court relied on *State v. Hicks* (1989), 43 Ohio St.3d 72, 538 N.E.2d 1030. In *Hicks*, the trial court did not instruct on voluntary intoxication despite evidence of intoxication. On appeal Hicks claimed that he was so intoxicated, through cocaine, that he could not form the specific intent to kill. The *Hicks* court recognized that "[t]he issue of intoxication is not raised as a defense to the element of purpose * * * merely because the evidence suggests reduced inhibitions, impaired judgment or

blurred appreciation by the defendant of the consequences of his conduct." *Id.* at syllabus.

**{¶ 27}** It is within the sound discretion of the trial court to determine whether the evidence is sufficient to require a jury instruction on intoxication. *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph two of the syllabus; *State v. Fox*, 68 Ohio St.2d 53, 22 O.O.3d 259, 428 N.E.2d 410. Evidence of intoxication is sufficient to raise the intoxication defense only where, if believed, it would support acquittal. *State v. Hicks*, 43 Ohio St.3d at 75, 538 N.E.2d at 1034.

**{¶ 28}** Here, there was evidence that Mitts was intoxicated during the police standoff, but the jury still could not have reasonably found that he lacked the capacity to form a specific intent to kill at the time of the murders. Testimony from witnesses who observed Mitts before or during the shootings does not support a finding that Mitts was so intoxicated that he did not intend what he was doing when he shot the victims. Around 8:00 p.m., when Timothy Rhone encountered Mitts in the hallway, Mitts displayed no signs of intoxication. Mitts held the gun "[p]erfectly steady" when he aimed it at Rhone's head. After 8:00 p.m., when Griffin saw Mitts walk up, aim, and shoot Bryant, Mitts was not staggering. Daniel O'Brien saw Mitts just after he killed Bryant and when Mitts shot at the first responding police car. O'Brien testified that Mitts was not staggering as he walked around, and he had no trouble ejecting the clip from his weapon, reloading, and firing several times at a police car.

**{¶ 29}** Between 8:30 and 9:00 p.m., after Mitts shot Lt. Kaiser and Sgt. Glivar, Lt. Kaiser tried to negotiate with Mitts for twenty or thirty minutes. Mitts threatened to kill Bryant's girlfriend, Griffin, as well as the entire police department. By refusing to surrender and demanding that the police come to his apartment and kill him, Mitts demonstrated that he was acting purposefully and knew what he had done and what he was doing. At that time, Mitts said he had been drinking, but he did not say how much and his speech was not slurred.

**{¶ 30}** Officer Mackey, who talked with Mitts even later, also noted that Mitts said he had been drinking, but Mitts was "calm" and "never angry," and his speech pattern did not indicate intoxication. Further, Mitts read the label on Glivar's shotgun and fired it twice, although he was unfamiliar with that weapon. Sgt. Robert Sackett, who joined in Mitts's lengthy conversations with Officer Mackey, thought Mitts seemed "completely sober."

**{¶ 31}** Chief Salerno, who first talked with Mitts around 8:30 p.m. during the police standoff, testified that Mitts would "giggle and laugh" at times, and at other times would "start getting angry." Mitts told Salerno that he had finished drinking a bottle of bourbon and was now drinking scotch. Salerno thought Mitts was drunk, but Mitts told him exactly what he had done, *i.e.,* killed a black man and shot two police officers. Detective Ronald Arco also thought Mitts was intoxicated when he overheard Mitts on the telephone around 9:42 p.m.

**{¶ 32}** Police Sergeant Gary Wolske, who stayed with Mitts after he was arrested around 2:00 a.m., described him as quiet, neither combative nor confused, and apparently sober. A nurse who first treated Mitts testified that he displayed no signs of intoxication. A Life Flight nurse, who saw Mitts later, thought he had been drinking, but his speech was not impaired. Mitts indicated that he knew what he had done because he told the nurse, "I'm a cop killer and you might as well kill me now." Mitts also said, "I think I killed a nigger."

**{¶ 33}** Mitts's strongest evidence of intoxication is his blood-alcohol level of .21 grams per one hundred milliliters taken at 3:43 a.m. Although the blood-alcohol level is evidence that Mitts was intoxicated at the time of the blood test, more than six hours after the shootings, it does not compel an intoxication instruction because the jury could not have inferred from it that the intoxication precluded Mitts from forming the intent to purposefully commit the murders.

{¶ 34} The evidence of intoxication could not have supported a verdict of acquittal. The trial court was correct in determining that an intoxication instruction was not required. Accordingly, we reject the fourth proposition of law.

II

Penalty Phase

A

Instruction on Nature of Life Sentences

{¶ 35} In his first proposition of law, Mitts argues that the trial court should have instructed the jury that it could recommend that Mitts receive consecutive life sentences on the two counts of aggravated murder. The trial judge denied Mitts's request for such an instruction. The court did not err by refusing to give Mitts's requested instruction because it is not an accurate statement of the law. See *State v. Scott* (1986), 26 Ohio St.3d 92, 101, 26 OBR 79, 87, 497 N.E.2d 55, 63. Under Ohio law, "[a] jury has no option of recommending whether life sentences should run consecutively or concurrently." *State v. Allard* (1996), 75 Ohio St.3d 482, 492, 663 N.E.2d 1277, 1287, citing *State v. Grant* (1993), 67 Ohio St.3d 465, 482, 620 N.E.2d 50, 69; see, also, R.C. 2929.03(D)(2).

{¶ 36} Mitts next argues that the trial court's failure/refusal to tell the jury, in response to a question, that he could or would require that life sentences, if recommended, be served consecutively violated Mitts's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. During penalty deliberations, the jury asked the judge, "Would a verdict of life imprisonment on count one and count two be served consecutively or concurrently?" The court answered that these aggravated murder counts "are separate and distinct counts. * * * [T]he matter or the question as to consecutive or concurrent sentencing is up to the Court * * *." Mitts contends that "[t]he jury question implies that the life option may have been recommended had the jury been

assured that the judge would or could order that the sentences be served consecutively."

**{¶ 37}** In *State v. Allard*, 75 Ohio St.3d at 492, 663 N.E.2d at 1287, when faced with the same issue, we responded that "assertions regarding the jury's possible motives for asking about consecutive and concurrent sentences are purely speculative" and "the trial court's response to the jury's question was proper, since a jury has no option of recommending whether life sentences should run consecutively or concurrently."

**{¶ 38}** Mitts relies on *Simmons v. South Carolina* (1994), 512 U.S. 154, 114 S.Ct. 2187, 29 L.Ed.2d 133. *Simmons* held that a trial judge violated an accused's due process rights by refusing to instruct the jury that a life sentence, under the facts and the applicable law, carried with it no possibility of parole. Mitts's reliance on *Simmons* is misplaced. In *Simmons,* South Carolina statutes prohibited Simmons's release on parole. This information was relevant given the prosecution's argument of Simmons's future dangerousness and the evidence that the public misunderstood the meaning of "life imprisonment" in South Carolina. In *Simmons*, a plurality reasoned that, to the extent that the jury's misunderstanding (that Simmons could be released on parole) pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration. *Id.* By contrast, in Mitts's case the prosecutor did not argue future dangerousness and there was no misunderstanding by the jury— the law in Ohio is that the judge is to make the determination of whether sentences will be served concurrently or consecutively. Moreover, counsel's argument that it was unrealistic to think that the trial judge would impose concurrent sentences here is speculative. Accordingly we overrule Mitts's first proposition of law.

B

Merger of Capital Specifications

**{¶ 39}** In his third proposition of law, Mitts contends that the trial court's failure to merge duplicative capital specifications was prejudicial error because significant mitigating evidence existed. Both aggravated murder counts charged Mitts with three course-of-conduct specifications, R.C. 2929.04(A)(5). For example, Count One, alleging the aggravated murder of Sgt. Glivar, included specification three, a course-of-conduct specification in which Bryant was killed. Specification four alleged a course of conduct in which Mitts attempted to kill Lt. Kaiser, and specification five alleged a course of conduct in which Mitts attempted to murder Officer Mackey. Count Two, alleging the aggravated murder of Bryant, included three similar specifications concerning Sgt. Glivar, Lt. Kaiser, and Officer Mackey.

**{¶ 40}** Multiple course-of-conduct specifications are duplicative and must be merged at the sentencing phase. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 194-200, 15 OBR 311, 337-342, 473 N.E.2d 264, 292-296. In fact, such multiple course-of-conduct specifications should not even be included in an indictment. In *State v. Spisak* (1988), 36 Ohio St.3d 80, 84, 521 N.E.2d 800, 803, this court held that "[e]ach aggravated *murder* count should thus contain only one specification that appellant's acts were part of a course of conduct." Further, if such multiple specifications are included in an indictment, the "trial court should instruct the jury in the penalty phase that those duplicative specifications must be considered merged for purposes of weighing the aggravating circumstances against the mitigating factors." *State v. Garner* (1995), 74 Ohio St.3d 49, 53, 656 N.E.2d 623, 630. No such instruction was given in this case. To determine whether that omission constituted reversible error we must engage in a two-pronged analysis. *Id.*, citing *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph five of the syllabus. In the first prong we determine "whether the

specifications at issue 'ar[o]se from the same act or indivisible course of conduct,' and were thus, in fact, duplicative." *Id.*, quoting *State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph five of the syllabus. The court of appeals correctly held, and the state concedes, that the specifications were duplicative.

**{¶ 41}** For the second prong, we must "determine whether the jury's penalty-phase consideration of those duplicative aggravating circumstances affected its verdict, and independently determine whether the merged aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt." *Id*. "[M]erging of aggravating circumstances [can] take place upon appellate review," and "resentencing is not automatically required." *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph five of the syllabus; *State v. Garner,* 74 Ohio St.3d at 53, 656 N.E.2d at 630; *State v. Spisak*, 36 Ohio St.3d at 84, 521 N.E.2d at 803.

**{¶ 42}** We find that the trial court's failure to instruct the jury that the duplicative specifications should be considered merged did not influence the jury to recommend the death penalty rather than life imprisonment. The outcome of the penalty hearing did not hinge on the failure to merge these three course-of-conduct specifications. We agree with the appellate court that merger of the duplicative course-of-conduct specifications into a single specification listing each shooting victim would not change the nature of the evidence which the jury was statutorily required to consider. Furthermore, the judge did not instruct the jury that its finding of guilt of multiple specifications should be deemed to increase the weight given the aggravating circumstances. Cf. *State v. Penix* (1987), 32 Ohio St.3d 369, 372, 513 N.E.2d 744, 747.

**{¶ 43}** Moreover, our independent weighing of the mitigating factors against the properly merged aggravating circumstances may be used to cure the penalty-phase error. *State v. Combs* (1991), 62 Ohio St.3d 278, 286, 581 N.E.2d

1071, 1079; *Clemons v. Mississippi* (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725.  Accordingly, we reject Mitts's third proposition of law.

C

Jury Instruction Issues

{¶ 44} With his fifth proposition of law, Mitts argues that the trial court erred by instructing the jury that its sentencing verdict was only a recommendation and not binding on the court.  Mitts's counsel failed to object at trial and waived all but plain error.  *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916, 925.  Plain error is an obvious error or defect in the trial proceedings that affects a substantial right.  Crim.R. 52(B).  Under this standard, reversal is warranted only when the outcome of the trial would have been different without the error.  *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 45} This court has previously held that the trial court does not err by referring to the jury's verdict as a recommendation or by recognizing that the trial court would make the final decision on the death penalty.  See, *e.g., State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80-81; *State v. DePew* (1988), 38 Ohio St.3d 275, 280, 528 N.E.2d 542, 550; *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph six of the syllabus.  Accordingly, we overrule Mitts's fifth proposition of law.

{¶ 46} In his sixth proposition of law, Mitts raises three additional penalty-phase issues, but Mitts's counsel failed to object or request additional instructions and again waived all but plain error.  *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.  First, Mitts argues that the trial court erred by giving the statutory definition of "reasonable doubt," as contained in R.C. 2901.05(D).  In doing so, the trial court referred to the "truth of the charge."  While this specific reference is inappropriate in the penalty-phase

context, this deficiency was not outcome-determinative. See *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 96; *State v. Woodard*, 68 Ohio St.3d at 76-77, 623 N.E.2d at 80; *State v. Spirko* (1991), 59 Ohio St.3d 1, 17, 570 N.E.2d 229, 248.

**{¶ 47}** Second, Mitts argues that the trial court gave an improper "acquittal-first" instruction on its sentencing deliberations in violation of *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286. The court did *not* instruct the jury that it could consider lesser penalties only if it first unanimously rejected the death penalty. Instead, the court instructed that if all twelve members of the jury found that the state had not proved that the aggravating circumstances outweighed mitigating factors, then it must choose between the possible life sentences. That instruction is consistent with R.C. 2929.03(D)(2) and does not constitute error. *State v. Taylor*, 78 Ohio St.3d at 28-29, 676 N.E.2d at 95; *State v. Davis* (1996), 76 Ohio St.3d 107, 116-118, 666 N.E.2d 1099, 1108-1109.

**{¶ 48}** Third, Mitts complains because the trial court instructed, without objection, that the jury "must not be influenced by *any* consideration of sympathy or prejudice," as opposed to the term "*mere* sympathy." Again, this issue lacks merit. Sympathy is not a relevant sentencing criteria, and "[t]here is no practical difference between 'mere sympathy' and 'any sympathy' in this context." *State v. Taylor*, 78 Ohio St.3d at 30, 676 N.E.2d at 96. The court's instruction to the jury not to consider sympathy or prejudice was a correct statement of the law. *State v. Allen* (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687; *State v. Steffen* (1987), 31 Ohio St.3d 111, 125, 31 OBR 273, 285, 509 N.E.2d 383, 396; *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph three of the syllabus. Thus, we reject Mitts's sixth proposition of law.

**{¶ 49}** With Proposition of Law VIII, Mitts argues that the trial court erred in refusing to instruct the jury that "it could consider as mitigating the fact that the appellant was highly intoxicated at the time of the offense." The court, however,

followed the statutory language in R.C. 2929.04(B), and accurately stated the law by instructing the jury to consider the accused's "history, character and background," as well as his lack of a criminal record and "[a]ny other factors that are relative [*sic*] to the issue whether defendant should be sentenced to death."

{¶ 50} Thus, the jury was allowed to consider all of the mitigation evidence including Mitts's asserted intoxication, as well as his counsel's argument that intoxication was a mitigating factor. The jury was not precluded from considering any evidence as mitigating. In *State v. Landrum* (1990), 53 Ohio St.3d 107, 122, 559 N.E.2d 710, 727-728, we held that a trial judge did not err by simply following the statutory language and declining to instruct that particular evidence was a possible specific mitigating factor. We find that Mitts's eighth proposition of law lacks merit.

D

Ineffective Assistance of Counsel

{¶ 51} In his seventh proposition of law, Mitts argues that his counsel's failure to object to improper jury instructions deprived him of his constitutional right to the effective assistance of counsel. Reversal of a conviction or sentence on the grounds of ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. To demonstrate that counsel is deficient, appellant must show that counsel's performance fell below an objective standard of reasonable representation. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. To demonstrate prejudice, appellant must prove that there exists a reasonable probability that were it not for counsel's error, the result of the trial would have been different. *Id.* at paragraph three of the syllabus.

**{¶ 52}** Mitts's claims of ineffective assistance do not meet the *Strickland* standard. Since we have previously concluded that the trial court's "acquittal first" instruction, "reasonable doubt" definition, and use of the term "recommendation" were not erroneous, counsel's performance was not deficient for failing to raise these issues. (See discussion of Propositions of Law V and VI, above.)

**{¶ 53}** As we discussed under Proposition of Law III, the course-of-conduct death-penalty specifications should have been merged. Any deficiency in counsel's failure to raise this issue, however, did not prejudice the defendant because, as we determined, the failure to merge was not outcome-determinative.

**{¶ 54}** Mitts also raises his counsel's failure to object to prosecutorial misconduct. On that point, however, Mitts fails to describe specifically any alleged prosecutorial misconduct. Hence, we reject this proposition of law.

E

Trial Court's Sentencing Opinion

**{¶ 55}** In his tenth proposition of law, Mitts argues that the "trial court improperly weighed the relevant sentencing factors" in imposing the death sentence on Mitts.

**{¶ 56}** In imposing a sentence, "the assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293, 305. The fact that mitigation evidence is admissible "does not automatically mean that it must be given any weight." *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. See, also, *State v. Stumpf* (1987), 32 Ohio St.3d 95, 509 N.E.2d 598, at paragraph two of the syllabus. R.C. 2929.03(F) does require, however, that the trial court state in its separate opinion its specific findings as to the existence of the mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances were sufficient to outweigh the mitigating factors. R.C. 2929.03(F); *State v.*

*Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph three of the syllabus.

**{¶ 57}** We agree with Mitts that the trial court erred by not separately weighing the aggravating circumstances in each count of aggravated murder. *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus. The trial court also incorrectly stated that no evidence of any statutory mitigating factors existed; in fact, the evidence showed that Mitts had no criminal record. See R.C. 2929.04(B)(5). Although the trial court correctly identified the aggravating circumstances, the trial court did not merge the specifications as it should have done. (See discussion on Proposition of Law III.) Nor does the trial court's opinion explain why the aggravating circumstances outweighed the mitigating factors. See *State v. Fox* (1994), 69 Ohio St.3d 183, 190-191, 631 N.E.2d 124, 130-131.

**{¶ 58}** Despite these deficiencies in the trial court's opinion, we find that reversal is not required. The court of appeals already noted these defects and determined, after an independent sentence review, that the death penalty was appropriate. Further, our "independent review of a sentence will cure any flaws in the trial court's opinion." *State v. Fox*, 69 Ohio St.3d at 191, 631 N.E.2d at 131. Accord *State v. Hill* (1996), 75 Ohio St.3d 195, 210, 661 N.E.2d 1068, 1082; *State v. Lott*, 51 Ohio St.3d at 170-173, 555 N.E.2d at 304-307. Accordingly, we overrule the tenth proposition of law.

### III

### Independent Sentence Assessment

**{¶ 59}** In his ninth proposition of law, Mitts argues that "the proven aggravating factors * * * do not outweigh the mitigating factors," summarizes the mitigating evidence, and outlines various mitigating factors he draws from that evidence. We will consider these arguments in our independent sentence review.

{¶ 60} Pursuant to R.C. 2929.05, we independently weigh the aggravating circumstances against the mitigating factors and determine whether Mitts's sentence is disproportionate to sentences in similar cases.

{¶ 61} Sgt. Glivar's murder has two aggravating circumstances: (1) that the victim was a peace officer in the line of duty (R.C. 2929.04[A][6]) and (2) that the murder was part of a course of conduct involving the purposeful killing or attempt to kill two or more persons (R.C. 2929.04[A][5]). Bryant's murder carries only the course-of-conduct aggravating circumstance. The evidence proves these aggravating circumstances beyond a reasonable doubt.

{¶ 62} We find that the nature and circumstances of these offenses do not offer the slightest mitigating value. In contrast, Mitts's history, character, and background are entitled to some mitigating weight. As several witnesses testified, Mitts was respected and loved by his family and was a devoted father. See *State v. Fox*, 69 Ohio St.3d at 194, 631 N.E.2d at 133. Mitts's brother testified that Mitts was the oldest child in the family and that while growing up Mitts looked after the younger children. Mitts's sister described Mitts as "laid-back" and a "gentle giant," who was very protective of his brothers and sisters. Mitts served honorably for four years in the Coast Guard, and he was gainfully employed all of his life. See *State v. Lundgren* (1995), 73 Ohio St.3d 474, 495, 653 N.E.2d 304, 324-325; *State v. Fox*, *supra*; *State v. Simko* (1994), 71 Ohio St.3d 483, 496, 644 N.E.2d 345, 350; *State v. Brewer* (1990), 48 Ohio St.3d 50, 64, 549 N.E.2d 491, 505. We accord all of these factors some mitigating weight.

{¶ 63} R.C. 2929.04(B)(1) through (4) and (6) are not applicable in this case. The victims did not "induce or facilitate" the offenses and Mitts did not act under "duress, coercion or strong provocation." (R.C. 2929.04[B][1] and [2].) The expert opinion testimony confirmed that Mitts did not suffer from any "mental disease or defect." (R.C. 2929.04[B][3].) Mitts was forty-two years old at the time of the offenses and was the principal offender. (R.C. 2929.04[B][4] and [6].)

**{¶ 64}** Mitts had no criminal record, and this "noteworthy" mitigating factor in R.C. 2929.04(B)(5) is entitled to significant mitigating weight. See *State v. Fox*, 69 Ohio St.3d at 195, 631 N.E.2d at 133-134.

**{¶ 65}** As to "other factors" (R.C. 2929.04[B][7]), Mitts claims remorse for his actions as well as the influence of alcohol as mitigating factors. Mitts's expression of remorse in his unsworn statement is entitled to some weight. See *State v. Rojas* (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376, 1387. As to alcohol, Mitts presented no evidence that he was an alcoholic, and voluntary drunkenness is entitled to very little mitigating weight. See, *e.g.*, *State v. Slagle*, 65 Ohio St.3d at 614, 605 N.E.2d at 931.

**{¶ 66}** We now weigh these mitigating factors against the aggravating circumstance(s) in each murder. "When a capital defendant is convicted of more than one count of aggravated murder, * * * [o]nly the aggravating circumstances related to a given count may be considered in assessing the penalty for that count." *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus. Based on the evidence, we find that the aggravating circumstances in the murder of Sgt. Glivar outweigh the mitigating factors. As to the murder of Bryant, we also find that the aggravating circumstance outweighs the mitigating factors.

**{¶ 67}** We further conclude that the death penalty imposed for each aggravated murder is appropriate and proportionate when compared with similar capital cases. As to "course of conduct" murders, see *State v. Allard* (1996), 75 Ohio St.3d 482, 663 N.E.2d 1277; *State v. Williams* (1996), 74 Ohio St.3d 569, 660 N.E.2d 724; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 652 N.E.2d 988; *State v. Loza* (1994), 71 Ohio St.3d 61, 641 N.E.2d 1082; *State v. Grant* (1993), 67 Ohio St.3d 465, 620 N.E.2d 50; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167; and *State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071. When compared with prior cases

involving the murder of a peace officer, the death penalty is also appropriate and proportionate.  See, *e.g.*, *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585; *State v. Glenn* (1986), 28 Ohio St.3d 451, 28 OBR 501, 504 N.E.2d 701.

{¶ 68} Accordingly, we affirm the convictions and death penalty.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

_____

APPENDIX

{¶ 69} "Proposition of Law I:  In a capital murder trial, the court must instruct the jury that it may recommend consecutive life sentences where the defendant has been convicted of two separate and distinct counts of aggravated murder.  The failure to instruct properly is violative of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 70} "Proposition Law II:  The trial court may not prohibit an expert witness from answering a hypothetical question where it is relevant and would assist the jury in analyzing the evidence.

{¶ 71} "Proposition of Law III:  Failing to merge capital specifications which results in jury consideration of duplicative aggravating factors cannot been [*sic*] held as harmless error where significant factors in mitigation were introduced into evidence.

{¶ 72} "Proposition of Law IV:  The trial court must charge the jury on the defense of voluntary intoxication where a reasonable jury could find that the defendant could not form the requisite intent due to his or her inebriation.  The failure to provide the intrution [*sic*] is violative of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

**{¶ 73}** "Proposition of Law V:  The trial court may not instruct the jury that its death verdict was only a recommendation but a life verdict was binding on the court.

**{¶ 74}** "Proposition of Law VI:  Inaccurate penalty phase instructions that misguide the jury as to their duties under the law render the resultant sentence unreliable and violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 9, 10 and 16, Article I, of the Ohio Constitution.

**{¶ 75}** "Proposition of Law VII:  Where trial counsel fails to object to erroneous jury instructions and improper comments of the prosecutor, the defendant is denied effective assistance of counsel where there is a reasonable probability that the death sentence would not have been recommended had counsel made the objections.

**{¶ 76}** "Proposition of Law VIII:  The trial court may not refuse to provide relevant mitigating instructions to the penalty phase jury.  The refusal to instruct is in contravention of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 77}** "Proposition of Law IX:  Where the proven aggravating factors in the evidence do not outweigh the mitigating factors present pursuant to Ohio Rev.Code § 2929.03, a sentence of the death sentence [is] violative of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

**{¶ 78}** "Proposition of Law X:  The trial court improperly weighed the relevant sentencing factors inviolation [*sic*] of R.C. 2929.03(F).

**{¶ 79}** "Proposition of Law XI:  Imposition of the death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I, of the Ohio Constitution."