{¶ 1} Appellant Robert Opalach appeals his murder conviction rendered after a jury trial. On appeal, he assigns the following errors for our review:
"I. The government failed to present sufficient evidence to support the underlying convictions."
"II. The underlying convictions are against the manifest weight of the evidence."
"III. The trial court erred in allowing the appellant's ex-wife, and others to hear testimony regarding multiple incidents of irrelevant, inflammatory and highly prejudicial `other acts' and character evidence."
"IV. The trial court committed plain error when it allowed the jurors to hear testimony from the appellant's ex-wife, and others, to testify regarding multiple incidents of irrelevant, inflammatory and highly prejudicial `other acts' including alleged acts of abuse from nearly 25 years earlier."
"V. Trial counsel was ineffective for failing to seek severance of the counts of the indictment."
"VI. The trial court erred in refusing to instruct the jurors that non-flight by a defendant can be indicative of the absence of the consciousness of guilt."
 {¶ 2} Having reviewed the facts and pertinent law, we affirm the trial court's decision. The apposite facts follow.
 {¶ 3} The events giving rise to the instant appeal began with an emergency call to the South Euclid Police Department on October 12, 2003, regarding a report of a sudden illness or possible overdose.
 {¶ 4} As a result, Sergeant James Wilson went to Opalach's home. When he arrived at the home, Opalach's son directed him to the television room. Upon entering the television room, Sergeant Wilson saw Mary Ann Potts, Opalach's companion for the past ten years, lying naked on the floor, moaning incoherently, with saliva foaming around her mouth.
 {¶ 5} Sergeant Wilson called her name, but Potts barely raised her arm slowly above her head and looked in his direction. Sergeant Wilson tried to keep Potts' eyes focused on him in an attempt to keep her awake until the paramedics arrived. During this time, Sergeant Wilson observed Opalach standing half-naked in the doorway, wearing only a shirt. Opalach appeared highly intoxicated, had a blank stare, glassy eyes, a strong odor of alcohol, and was defecating on the floor.
 {¶ 6} After the paramedics arrived and asked how Potts came to be in that condition, Opalach informed them that she had taken too many Cataflams, an anti-inflammatory medication. Thereafter, the paramedics attempted to get Potts to respond to both verbal and non-verbal stimuli but were unsuccessful. Consequently, the paramedics transported Potts to Hillcrest Hospital, where she died two days later.
 {¶ 7} The coroner ruled Potts' death a homicide. Subsequently, the Cuyahoga County Grand Jury returned a four-count indictment against Opalach for aggravated murder, murder, and two counts of felonious assault. Opalach pled not guilty at his arraignment, and after extensive pretrials and discovery, the matter proceeded to trial.
 Jury Trial {¶ 8} At trial, Dr. John Felo, from the coroner's office, testified that he performed the autopsy on Potts. Dr. Felo stated Potts suffered a subdural hematoma, which is a collection of blood underneath the skull. As the blood pooled in Potts' head, it caused pressure on her brain, which resulted in swelling. The swelling in her brain restricted the blood supply, which led to her developing strokes. Dr. Felo opined that the subdural hematoma occurred three to five days prior to Potts' death.
 {¶ 9} Additionally, Dr. Felo testified that the subdural hematoma was caused by a blunt force injury. Dr. Felo stated that Potts had numerous bruises on her body, including symmetrical bruises under both sides of her chin. The symmetrical bruises under the chin were consistent with a grab mark from a hand. There were also bruises caused by blunt force on Potts' right arm, right torso, upper back, buttocks, right shoulder, right jaw, and right forehead.
 {¶ 10} Finally, Dr. Felo testified that the toxicology report revealed there was no alcohol or illicit drugs in Potts' blood when she was admitted to the hospital. Furthermore, no alcohol was detected in the blood from the subdural hematoma, indicating she did not have alcohol in her system when she developed the subdural hematoma.
 {¶ 11} At trial, Opalach's son, Kenneth, testified that on September 1, 2003, he went to live with his father and Potts. He stated that he knew they were both alcoholics, but did not realize the extent of their degeneration until he moved in. Kenneth described his father and Potts as being in a constant state of intoxication, having difficulty walking, talking, sleeping, and taking care of themselves. Kenneth stated he often witnessed bickering and some physical confrontation between Opalach and Potts. However, Kenneth compared these episodes to "two kids in the back seat of a car who don't get along."
 {¶ 12} Kenneth testified that on October 12, 2003, after coming upstairs from the basement, he saw his father sitting in a chair and Potts lying naked on the floor. Potts was foaming at the mouth and had bruises all over her body. Kenneth asked Opalach what had happened to Potts, but Opalach told him he could not remember. Consequently, Kenneth placed the emergency call to the police.
 {¶ 13} Kevin Nietert, assistant police chief of the city of South Euclid, testified that on October 13, 2003, he arrested Opalach at his home. Chief Nietert stated that Opalach agreed to talk with him about the emergency call to the police department regarding Potts. In their conversation, Opalach indicated that Potts had been drinking heavily and she had taken approximately nineteen Cataflam and Percogesic pills. Opalach also indicated that Potts had been lying on the floor for three or four days, but he did not find this unusual. He attempted to wake Potts by grabbing her around the ribs and shaking her, but denied hurting her. In addition, Opalach stated that he did not realize Potts' condition was that serious until she started foaming at the mouth.
 {¶ 14} Chief Nietert testified that he asked Opalach if he had ever struck Potts, and Opalach admitted that he had slapped her about ten to fifteen times. He stated that the last time he struck Potts was about a month prior to the date of the emergency call. Opalach claimed that he usually slapped Potts when she disturbed his sleep, and in those instances he merely pushed her away.
 {¶ 15} Chief Nietert testified that on October 16, 2003 he had a second conversation with Opalach, wherein he informed Opalach that Potts had died. In this conversation, Opalach indicated that on October 9, 2003, he and Potts were drinking, watching movies, and having a good time. At about 11:30 p.m., he decided to go to bed, but Potts, who had been drinking and taking pills, did not want to go to bed.
 {¶ 16} When he awoke the next morning, Potts was not in bed. He went downstairs and found her passed out on the floor of the television room. He tried to wake her by calling her name, grabbing her, patting her cheek, and tickling her ribs, but she would not respond.
 {¶ 17} Chief Nietert testified as follows regarding the rest of the conversation:
"Q. What else did he tell you?
A. He said he was hoping that she'd be able to fill in the blank in his memory.
Q. He said he was hoping she would be able to fill in the blanks in his memory?
A. Correct.
Q. What else did he tell you?
A. He said they were having such a good time he couldn't understand how things could have gotten or become violent.
Q. How things could have gotten so violent; what night was he referring to?
A. He's referring to Thursday, the night — Thursday night, which would be October 9th.
Q. How was his recollection?
A. He said he only had some or limited recollection.
Q. And did he tell you what he wanted to see happen to this whole situation?
A. He said that he would like to see this whole thing dropped.
Q. What else did he tell you?
A. That he never meant to kill Mary Ann."
 {¶ 18} Chief Nietert further testified that in the early afternoon of October 16, 2003, Opalach requested to speak with him. During this meeting, Opalach made an oral and written statement. Chief Nietert testified as follows regarding Opalach's oral statement:
"Q. Okay. Now referencing Court's Exhibit 2, what did Mr. Opalach, the defendant, tell you or relate to you this time?
A. He stated this time that on Thursday the 9th of October that he and Mary Ann Potts were watching a movie called To Kill A Mockingbird and that he had seen this movie at least 20 times. He said that they were in the first floor television room, that they were having a good time and that both of them were drinking heavily. He also stated that Ms. Potts was taking pills, the Cataflam and Percogesic, which upset him.
Q. Okay. Did he indicate anything about the Percogesic pills?
A. He said that he had taken or — or that he had taken or hidden the bottle of Percogesic pills, he thought at the time in the seat cushion.
Q. And you ultimately found a bottle of Percogesic you said by the magazine rack?
A. Correct, which was next to the chair.
Q. Did he indicate anything else to you about the movie?
A. He said because he had seen this movie many a times he was tired and he wanted to go to bed early. He had discussed with Mary Ann Potts about going to bed early. This — oftentimes she would get upset if he went to bed early because she didn't want to be left alone.
Q. So what did he do at this point?
A. He got up from his chair to proceed to go to bed and when he got up from his chair to go to bed Mary Ann Potts had grabbed him around his left thigh. At that point in time he said he was in no mood for an argument and he slapped Mary Ann Potts across the face and head with his right hand.
Q. So he told you he was in no mood for an argument and that he slapped her across the face and head with his right hand?
A. Correct.
Q. What else did he tell you — did he tell you on which side of the face he slapped her?
A. He said that he struck her on the left side of her face.
Q. And did he tell you what happened to her after he slapped her?
A. She fell backward between the sofa and the table. He —
Q. What did he do, did he tell you what he did after she fell backwards?
A. He left the room, walked out and turned the T.V. off and went upstairs and went to bed.
Q. Did he tell you what happened when he awoke on Friday?
A. When he awoke on Friday he said that he went downstairs and that Mary Ann was laying basically in the same position she was when he had left her last and that she was, unresponsive but that the T.V. was on this time."
 {¶ 19} At the conclusion of the state's case in chief, the trial court dismissed the charge of aggravated murder. After the trial, the jury returned a verdict of guilty to murder and to one count of felonious assault. Both counts were merged for purposes of sentencing. The trial court sentenced Opalach to a mandatory term of incarceration of fifteen years to life. Opalach now appeals.
 Sufficiency of Evidence {¶ 20} Under his first assignment of error, Opalach argues the state failed to present sufficient evidence to demonstrate that he caused Potts' injuries, that he acted knowingly, or that Potts suffered serious physical harm as opposed to merely physical harm. We disagree.
 {¶ 21} A challenge to the sufficiency of evidence supporting a conviction requires the appellate court to determine whether the state met its burden of production at trial. State v. Thompkins (1997),78 Ohio St.3d 380, 1997-Ohio-52. On review for legal sufficiency, the appellate court's function is to examine evidence admitted at trial and determine whether such evidence, if believed, would convince the average person of the defendant's guilt beyond a reasonable doubt. Id.; State v.Fryer (1993), 90 Ohio App.3d 37. In making its determination, an appellate court must view the evidence in a light most favorable to the prosecution. Id. at 43.
 {¶ 22} In the instant case, the evidence was sufficient to convict Opalach for the charged crimes. Opalach admitted that on Thursday, October 9, 2003 he slapped Potts on the left side of her face, she fell backwards between the sofa and the table, and remained in that position for more than three days. Dr. Felo testified that Potts died as a result of a subdural hematoma brought on by a blunt force injury. Dr. Felo stated that Potts had numerous bruises, including symmetrical grab marks under her chin, which indicated that a hand caused these marks. In addition, Potts had bruises on her jaw and forehead. Finally, Dr. Felo testified that the subdural hematoma was three to five days old, from the time Potts died. This estimation coincides with the time frame that Opalach admitted to slapping Potts. Thus, Opalach's admission and the coroner's independent findings demonstrate that Opalach caused the injuries that led to Potts' death.
 {¶ 23} Nevertheless, Opalach argues he did not act knowingly. Although it was well documented that both Opalach and Potts suffered from alcoholism, voluntary intoxication is not a defense to any crime. Statev. Mitts (1998), 81 Ohio St.3d 223, 229, 1998-Ohio-635; State v. Fox
(1981), 68 Ohio St.2d 53, 54-55. Nonetheless, "where specific intent is a necessary element, * * * if the intoxication was such as to preclude the formation of such intent, the fact of intoxication may be shown to negative this element." Id. at 55; see, also, R.C. 2901.21(C). Even severe intoxication, however, can co-exist with purpose. State v. Mitts,81 Ohio St.3d at 229; State v. Hicks (1989), 43 Ohio St.3d 72, 74.
 {¶ 24} A person acts knowingly regardless of his purpose when he is aware that his conduct will probably cause a certain result or he is aware that his conduct will probably be of a certain nature. Knowingly also means that a person is aware of the existence of the facts that his acts will probably cause a certain result or be of a certain nature.State v. Bissantz (1982), 3 Ohio App.3d 108, 111.
 {¶ 25} Here, Opalach acted knowingly. He admitted that he slapped her across the face and head and she landed on the floor and never moved again. He admitted: "I was shown pictures of her. Some of her bruises were from me, most were from falling down drunk." The evidence indicated that she was not intoxicated at the time of her fall.
 {¶ 26} R.C. 2901.01(A)(5) defines serious physical harm as "* * * (b) any physical harm that carries a substantial risk of death; (c) any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity * * *." Opalach caused serious physical harm when he knocked Potts to the ground (physical harm), which incapacitated her for three days (substantial incapacity).
 {¶ 27} After viewing the above evidence in a light most favorable to the prosecution, we conclude any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. Accordingly, we overrule Opalach's first assignment of error.
 Manifest Weight {¶ 28} In the second assignment of error, Opalach argues that his conviction for felonious assault and murder were against the manifest weight of the evidence. We disagree.
 {¶ 29} Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of evidence. State v. Thompkins, 78 Ohio St.3d at 387.
 {¶ 30} When an appellant challenges a conviction on manifest weight grounds, we review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, "and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983), 20 Ohio App.3d 172,175, citing Tibbs v. Florida (1982), 457 U.S. 31, 38, 42. See, also, State v. Thompkins, supra. The discretionary power to grant a new trial should be exercised only in exceptional cases in which the evidence weighs heavily against the conviction. Id.
 {¶ 31} Stated succinctly, a reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all elements of an offense have been proven beyond a reasonable doubt. State v. Eskridge (1988), 38 Ohio St.3d 56, paragraph two of the syllabus; State v. Eley (1978), 56 Ohio St.2d 169, syllabus.
 {¶ 32} After reviewing the evidence in the instant case, it cannot be said that the jury clearly lost its way in finding Opalach guilty of felonious assault and murder so as to constitute a miscarriage of justice. As previously noted, Opalach admitted that he slapped Potts across her face and head, causing her to fall backwards between the sofa and table. Potts remained in that position for more than three days, until the paramedics were called. Further, the coroner's independent findings led to the logical conclusion that Opalach caused the injuries that resulted in Potts' demise. Accordingly, Opalach's second assignment of error is overruled.
 Other Acts Testimony {¶ 33} Under the third and fourth assignments of error, Opalach argues the trial court erred in allowing "other acts" testimony to be heard by the jurors. We disagree.
 {¶ 34} The trial court has broad discretion in the admission of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should be slow to interfere. State v. Maurer (1984), 15 Ohio St.3d 239;State v. Hymore (1967), 9 Ohio St.2d 122, 128. To constitute an abuse of discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable. State ex rel. The V Cos. v. Marshall (1998),81 Ohio St.3d 467, 469.
 {¶ 35} Generally, evidence of prior criminal acts, wholly independent of the crime for which a defendant is on trial, is inadmissible. Statev. Thompson (1981), 66 Ohio St.2d 496, 497. R.C. 2945.59 codifies the exceptions to this rule, providing:
"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."
 {¶ 36} Evid.R. 404(B) is in accord with R.C. 2945.59. State v. Broom
(1988), 40 Ohio St.3d 277, 281. It states that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 {¶ 37} Hence, it is necessary to determine whether any of the matters enumerated in R.C. 2945.59 were relevant at trial and, if so, whether the testimony that the prosecution elicited regarding other acts of the defendant tended to prove the relevant enumerated matters. State v.Curry (1975), 43 Ohio St.2d 66, 70.
 {¶ 38} Here, Opalach argues the trial court allowed the state to attack his character by introducing testimony regarding multiple incidents of alcohol abuse and domestic violence. However, a review of the record indicates that Opalach's oral and written statements to the police give an exhaustive account of Opalach's and Potts' alcohol abuse and the domestic violence that they inflicted on each other. Thus, Opalach's own admissions confirm the other acts testimony of the state's witnesses. For example, at trial, Detective Adornetto testified that Opalach indicated to him that he had physical arguments with Potts, and at times hit her with an open hand. Such a statement is admissible because it is directly related to the offenses for which he was charged.
 {¶ 39} Further, Opalach claimed that Potts' injury and ultimate death were the result of an accident, and under Evid.R. 404(B), other acts evidence may be admitted to refute the claims of an accident. State v.Parker (Dec. 9, 1999), Cuyahoga App. Nos. 75117 and 75118. Thus, the testimony was offered to show lack of accident, and its admission was proper. Accordingly, Opalach's third and fourth assignments of error are overruled.
 Ineffective Assistance of Counsel {¶ 40} In the fifth assignment of error, Opalach argues that trial counsel was ineffective for failing to seek severance of the counts of the indictment. We disagree.
 {¶ 41} In evaluating whether Opalach has been denied his Sixth Amendment right to effective assistance of counsel, the ultimate query is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." State v. Hester (1976),45 Ohio St.2d 71, paragraph four of the syllabus.
 {¶ 42} In order to prevail on a claim of ineffective assistance of counsel, Opalach must show trial counsel's performance fell below an objective standard of reasonableness and such performance resulted in undue prejudice. State v. Madrigal, 87 Ohio St.3d 378, 397, 2000-Ohio-448. In this regard, Opalach has the burden of proof, because in Ohio a properly licensed attorney is presumed competent. State v. Calhoun,86 Ohio St.3d 279, 1999-Ohio-102. An essential element of an ineffective assistance of counsel claim is a showing that, but for trial counsel's alleged errors, there is a substantial probability that the outcome of the trial would have been different. State v. Lindsey, 87 Ohio St.3d 479,489, 2000-Ohio-465.
 {¶ 43} In the instant case, Opalach argues that trial counsel should have sought to sever counts one, two, and three from count four, an earlier felonious assault. Counts one, two, and three alleged the offenses of aggravated murder, murder, and felonious assault on October 9, 2003 to October 15, 2003. Count four alleged felonious assault on September 5, 2003.
 {¶ 44} In order to determine whether Opalach's counsel was deficient, we must determine whether severance was appropriate.
 {¶ 45} Crim.R. 8(A) provides: "Joinder of offenses. Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."
 {¶ 46} Generally, the law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character. State v. Lott (1990), 51 Ohio St.3d 160, 163. Joinder is favored for many reasons, among which are the avoidance of multiple trials, conserving time and expense, diminishing the inconvenience to witnesses and minimizing the possibility of incongruous results in successive trials before different juries. State v. Torres (1981),66 Ohio St.2d 340.
 {¶ 47} However, if joinder would prejudice a defendant, the trial court is required to order separate trials. Crim.R. 14. It is the defendant who bears the burden of demonstrating prejudice and that the trial court abused its discretion in denying severance. State v. Hill,
Cuyahoga App. No. 80582, 2002-Ohio-4585, citing State v. Coley,93 Ohio St.3d 253, 2001-Ohio-1340. A defendant's claim of prejudice is negated when (1) evidence of the other crimes would have been admissible as "other acts" evidence under Evid.R. 404(B), or (2) the evidence of each crime joined at trial is simple and direct. Lott, supra, at 163; see, also, State v. Schaim, 65 Ohio St.3d 51, 59, 1992-Ohio-31; State v.Franklin (1991), 62 Ohio St.3d 118, 122.
 {¶ 48} Here, a review of the record indicates that the evidence concerning each charge was simple and direct. Nevertheless, Opalach citesState v. Schaim (1992), 65 Ohio St.3d 51, in support of his argument.Schaim is distinguishable from the instant case. First, it involved three separate victims, each of whom had a different relationship to Schaim and were of dissimilar age. Second, Schaim involved different types of sexual conduct. Finally, it involved acts that were more remote in time than the instant offense.
 {¶ 49} Further, we note, Opalach was acquitted of count four, the felonious assault against Potts on September 5, 2003, which he now complains should have been severed. Consequently, Opalach has failed to affirmatively demonstrate how he was prejudiced by the joinder. Torres,
supra. See, also, State v. Ventus (Sept. 19, 1994), Butler App. No. CA94-03-057.
 {¶ 50} We conclude that the cumulative effect of the perceived errors is not "so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." State v. Smith (1997),80 Ohio St.3d 89, 112, citing Strickland, 466 U.S. at 687. Accordingly, we overrule Opalach's fifth assignment of error.
 Nonflight {¶ 51} Finally, under his sixth assignment of error, Opalach argues the trial court should have instructed the jury that his nonflight could be indicative of the absence of a consciousness of guilt. We disagree.
 {¶ 52} The Supreme Court of Ohio has repeatedly upheld the use of an instruction on flight. State v. Taylor (1997), 78 Ohio St.3d 15,1997-Ohio-243. However, Opalach has cited no authority to support his notion that nonflight may be used to negate evidence of guilt. As such, this claim lacks merit. Accordingly, we overrule Opalach's sixth assignment of error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this Court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, P.J., and Sweeney, J.,* Concur.
* (Sitting by Assignment: Judge James D. Sweeney, Retired, of the Eighth District Court of Appeals.)